1
2
3
4                      IN THE UNITED STATES DISTRICT COURT
5
6                      FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
8
9    JOSE AYALA et al.,                    NO. C08-0119 TEH
10                    Plaintiffs,          ORDER GRANTING IN PART
                                           AND DENYING IN PART
11          v.                             MOTION FOR SUMMARY
                                           JUDGMENT OF DEFENDANTS
12   PACIFIC MARITIME                      ILWU AND LOCAL 13
     ASSOCIATION, et al.,
13
                      Defendants.
14
15

16          This matter came before the Court on August 24, 2009, on the Motion for Summary

17   Judgment filed by Defendants International Longshore and Warehouse Union ("ILWU") and

18   Local 13 of the ILWU ("Local 13").   For the reasons set forth below, the Motion is

19   GRANTED IN PART and DENIED IN PART.

20

21   **FACTUAL BACKGROUND**

22          Plaintiffs are seven longshoremen registered in the ports of San Francisco and Oakland

23   ("SF Port") who seek transfers to the ports of Los Angeles and Long Beach ("LA Port").

24   They allege in their Third Amended Complaint ("TAC") that their transfer requests have

25   been improperly denied by the ILWU, its Local 13 – which represents longshoremen who

26   work out of the LA Port – and the Pacific Maritime Association ("PMA"), the collective

27   bargaining representative of companies employing longshoremen.  Plaintiffs claim that the

28   ILWU, Local 13, and the PMA (collectively, "Defendants") breached their collective

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   bargaining agreement and the duty of fair representation and denied them equal rights and

2   privileges of union membership, and that Local 13 violated California public policy by

3   arbitrarily excluding them from employment.

4       Plaintiffs' claims against the PMA have been settled, and the remaining Defendants

5   ILWU and Local 13 (collectively, "Union Defendants") are precluded from seeking

6   contribution or indemnification against the PMA in this lawsuit.  *See* 7/1/09 Order Barring

7   Claims for Contribution and Indemnification.  The Union Defendants now move for

8   summary judgment on all causes of action.[1]

9

10  **I.     UNION RULES GOVERNING TRANSFER REQUESTS**

11      The Pacific Coast Longshore Contract Document ("PCLCD" or "Agreement") is the

12  collective bargaining agreement governing wages, hours, and terms of employment for West

13  Coast longshoremen represented by the ILWU and employed by PMA-member companies.

14  Every port covered by the Agreement falls under the jurisdiction of a Joint Port Labor

15  Relations Committee ("JPLRC" or "Port Committee"), comprised of representatives from

16  PMA-employers and the port's ILWU-affiliate local union.  Each Port Committee is, in turn,

17  subject to the control of the Joint Coast Labor Relations Committee ("JCLRC," or "Coast

18  Committee"), whose membership is drawn from the highest level of the PMA and the ILWU.

19      Every Port Committee maintains a list of "registered" and "identified casual" workers

20  and operates a hiring hall where those longshoremen obtain work.  Sundet Decl. in Supp. of

21  Mot. for Summ. J. ("Sundet Decl."), ¶ 4; Agreement §§ 8.11, 8.31, Sundet Decl., Ex. A.

22  Jobs are disseminated by seniority.  The first preference is given to "Class A" or "fully

23  registered" longshore workers, those with the most experience and training; second priority

24  goes to "Class B" longshoremen, junior or apprentice workers who have "limited

25  registration."  Agreement § 8.41.  Only after all available registered workers have been

26  _____

27      [1] The Court is in receipt of the Union Defendants' Objections to Evidence Submitted
    by Plaintiffs in Opposition to Defendants' Motion for Summary Judgment, Dkt. No. 134.  As
    the Court has not, in this Order, relied on any evidence to which objections were raised, there
28  is no need to rule on the objections.

United States District Court

For the Northern District of California

dispatched do jobs come available to identified casuals.  The Port Committee elevates Class B workers to Class A status, and identified casuals to Class B status, based on time worked and other eligibility requirements after assessing its manpower needs each quarter.  Workers are added to the identified casuals list "only sporadically at intervals of several years," Sundet Decl. ¶ 7, although Plaintiffs claim that "Local 13 is continually registering new workers" in the LA Port, Pls.' Ex. 14, Decl. of Jose Ayala, ¶ 6.  Once on the casuals list, a worker may rise through the ranks to limited and finally fully registered status, a process Plaintiffs characterize as joining the registration list "from below."  Opp'n at 3.

The other way to get on the LA Port's registration list is "from the 'side,'" by transferring.  Opp'n at 3.  A longshoreman registered at one port enjoys "joint coastwide registration," allowing him to transfer into or visit another port.  Agreement § 8.32.  Supplement I of the Agreement, which sets out the "rights and obligations of coastwise registration in regard to transfers between ports," *id.*, provides that a fully registered longshoreman "may transfer to another port" when certain conditions are met, *id.*, Supp. I, § 1.1.  Notably, the JPLRC for the port into which transfer is sought must, "by applying the *usual rules*[,] find[] there is an opening available for him on the list of such port and approve[] him for transfer of registration."  *Id.*, Supp. I, § 1.13 (emphasis added).  Any fully registered longshoreman who transfers to another port will maintain his Class A status and seniority.  *See id.*, Supp. I, § 1.6. (providing that a transferee's place on the new port's Class A list "shall be determined by his total Class A and Class B registered time as compared to such time of those on the Class A list of the port to which he transfers").  Article XVII of the ILWU Constitution also governs transfers, imposing certain limits on a member's ability to transfer, and mandating that any member who is accepted for a transfer "shall not be required to pay an initiation fee."  ILWU Constitution, Art. XVII, §§ 1-5, Sundet Decl., Ex. C.

The "usual rules" applied by the LA Port Committee to decide transfer requests can be distilled to one:  the "reciprocal transfer rule."[2]  In order to transfer onto the LA Port's

---

[2] There is, however, an internal dispute within the LA Port Committee and the Coast Committee over whether or not the reciprocal transfer rule is, in fact, part of the "usual rules."  See *infra*.

registration list, a Class A longshoreman affiliated with another local must swap places with a Class A worker from the LA Port, who will take the transferring worker's place at the port he leaves.  The Union Defendants trace the rule as far back as 1972, when the minutes of an LA Port Committee meeting noted that the employers "stated they cannot agree to the request to transfer" of a longshoreman until he "has a reciprocal transfer."  Ponce de Leon Decl. in Supp. of Mot. for Summ. J. ("Ponce de Leon Decl."), ¶ 10, Ex. C.  The reciprocal transfer rule also appears in the minutes of a 1983 LA Port Committee meeting, where employers discussing a transfer request "stated the 'usual rules' under Section 1.13 of Supplement I are that individuals have not been allowed to transfer into the Port of Los Angeles-Long Beach on a nonreciprocal basis."  *Id.*, ¶ 10, Ex. B.  Reciprocal transfer is not a policy unique to Local 13.  Indeed, Local 10 – which has jurisdiction over the SF Port – similarly applies the reciprocal transfer rule when the member of another local seeks to transfer to San Francisco.  *See* Goldberg Decl. in Supp. of Mot. for Summ. J. ("Goldberg Decl."), ¶ 13, Ex. L, Depo. of Farless F. Dailey, III, at 63:9-64:12 (testifying that a transfer applicant would have to "find a member in good standing within Local 10 who wants to trade books").

The LA Port Committee also allows transfers through two other mechanisms: an "owe-me" transfer, and a hardship transfer.  The "owe-me" transfer is a variation on the reciprocal transfer rule where reciprocation is not simultaneous:  Local 13 accepts a transfer from another local on the understanding that a Local 13 member could transfer to that local at some time in the future.  Local 13 only allows "owe-me" transfers when there is "an understanding that you're going to have people from Local 13 wanting to transfer out to other areas, a desirable place."  Pls.' Ex. 6, Depo. of Timothy Podue, at 100:18-23.  A hardship transfer may be granted "to individual longshore workers who have a compelling need to work in the Port of Los Angeles-Long Beach as a result of a serious personal medical issue or to care for a family member with a serious medical issue that can only be treated properly in the LA/LB area."  Podue Decl. in Supp. of Mot. for Summ. J., ¶ 4.  However, as Plaintiffs complain and the Union Defendants acknowledge, "Local 13 has no rules, written

1   or otherwise, governing how to apply for, or to merit, such a transfer."  Opp'n at 6; *see also*

2   Pls.' Ex. 3, Depo. of Mike Freese, at 143:20-144:9.

3

4   **II.   PLAINTIFFS' TRANSFER REQUESTS**

5          Plaintiffs are all Class A longshoremen registered in the SF Port and represented by

6   ILWU Local 10.  Since 2002, each has attempted to transfer his registration to the LA Port

7   for a variety of personal, family, and medical reasons.  Jose Ayala testified in deposition that

8   moving from the Bay Area to Irvine markedly improved his son's asthma, eliminating his

9   dependence on steroid medication.  Pls.' Ex. 31, at 128:11-130:8.  Joseph Lawton, already

10  living in Los Angeles, found that the LA Port offered more skilled jobs than the SF Port.  *Id.*

11  Ex. 32, at 145:25-146:18, 162:12-25.  Kimani Stafford sought a transfer to move away from

12  his ex-wife, with whom he had an acrimonious divorce.  Pls.' Ex. 35, at 31:8-33:21.  Jose

13  Linarez testified that living near his family in Los Angeles would allow his sister, a nurse, to

14  help care for his 16-year-old son, who is autistic, Pls.' Ex. 33, 28:13-30:1, and Leroy Phillips

15  similarly said the presence of family in Los Angeles could ease the burden of childcare for

16  his own autistic son, Pls.' Ex. 34, 90:4-6.  Deandre Whitten purchased a home in Los

17  Angeles, where his wife was employed and his daughter enrolled in school.  Pls.' Ex. 36,

18  67:13-68:12.[3]

19         Three of the seven Plaintiffs began seeking transfers in 2002.  Ayala, Lawton, and

20  Phillips were included on a list of 92 Class "A" longshoremen from Local 10 requesting a

21  transfer to Local 13 in November 2002.  However, that request was never approved by the

22  SF Port Committee, and the employers opposed it because "serious and consistent labor

23  shortages" in San Francisco meant "[t]hese workers are needed in their home port."  Pls.' Ex.

24  10.  Those same three Plaintiffs, plus Whitten and three other Class A members of Local 10,

25  later made another transfer request, as documented in a September 2005 letter to the Coast

26  Committee complaining that they "never received an official answer" after following the

27  _____

28          [3] No explanation has been provided as to why the seventh Plaintiff, Gonzalo Torres, seeks to transfer to the LA Port.

United States District Court

For the Northern District of California

1  procedures for transfer.  Ponce de Leon Decl., Ex. E.  Ayala testified that he never received a

2  response to that letter.  Pls.' Ex. 31, at 55:3-13.

3        By 2007, all seven Plaintiffs had requested transfers.  In a May 24, 2007 letter, Local

4  10's Secretary-Treasurer notified Frank Ponce de Leon, his counterpart in Local 13, that

5  Local 10 had cleared the seven for transfer.  Ponce de Leon Decl., Ex. D.  He requested that

6  the issue be addressed "at your next LRC meeting."  *Id.*  Ponce de Leon never acted on that

7  request, a failure he attributed  to his mistaken belief – after having seen the September 2005

8  letter – that the issue was already pending at the ILWU.  *Id.* ¶ 11.  Plaintiffs followed up with

9  a letter on July 17, 2007, asking that their request be brought before the LA Port Committee

10  – or that they otherwise be told "why we are being denied what we believe to be our right."

11  *Id.*, Ex. F.  Only then did Ponce de Leon realize that the 2005 letter was not signed by the

12  same individuals requesting a transfer in 2007.[4]  *Id.* ¶ 12.  He placed the transfer request on

13  the agenda for the next LA Port Committee meeting – but then removed it because the

14  agenda "was already too long" and because Plaintiffs "made no mention" of having secured

15  reciprocal transfers.  *Id.* ¶ 13.

16        Plaintiffs' counsel notified the Coast Committee in a September 5, 2007 letter that the

17  request to the LA Port Committee had gone unacknowledged, and asked that the Coast

18  Committee consider the transfers.  Sundet Decl., ¶ 14, Ex. D.  That committee did so on

19  September 27, 2007, concluding that the requests remained pending at the local levels: four

20  Plaintiffs had yet to be released by the SF Port Committee,[5] and the other three had to seek

21  the approval of the LA Port Committee.  *Id.* ¶ 15, Ex. E.  ILWU's counsel informed

22  Plaintiffs' counsel of this decision in an October 17, 2007 letter: given that transfer requests

23  "are processed and decided by the local parties involved, not the Coast Parties," Plaintiffs'

24  letter would be forwarded to the LA Port Committee's local counsel.  *Id.* ¶ 16, Ex. F.  After

---

25        [4] Although the 2005 letter was also signed by seven longshoremen, three were

26  different than those who signed the 2007 letter; the other four of those seven are now
    Plaintiffs.

27
          [5] The Coast Committee later acknowledged that it was mistaken about the number of

28  Plaintiffs who had yet to be released by the SF Port Committee: six, not three, had been
    released.  Pls.' Ex. 39.

*(left margin, vertical text)* United States District Court  For the Northern District of California

United States District Court

For the Northern District of California

1   another eight months went by, the Coast Committee sent a letter to the LA Port Committee

2   reminding it of its "contractual obligation to address the requests, given the action of the" SF

3   Port Committee. Pls.' Ex. 39. After noting an error in its September 27, 2007 observation

4   that only three of the seven longshoremen had been released – "in fact . . . six (6) were

5   released by the San Francisco JPLRC" – the Coast Committee gave the LA Port Committee

6   thirty days to consider the requests and set forth its explanations in the local minutes. *Id.*

7          The LA Port Committee considered the transfers of six Plaintiffs at its July 15, 2008

8   meeting; the request of the seventh Plaintiff, Stafford, went unaddressed because he was off

9   work due to injury and had not been released to transfer by the SF Port Committee.[6] Local

10  13 sought to deny all of the requests based on Plaintiffs' failure to obtain reciprocal transfers.

11  The PMA employers, disavowing the reciprocal transfer rule, supported the requests of

12  Plaintiffs Phillips, Lawton, and Ayala, but opposed transferring Plaintiffs Torres, Linares,

13  and Whitten because open employer complaints rendered them ineligible under Supplement

14  I. The LA Port Committee denied the latter three Plaintiffs' requests — based, alternatively,

15  on the lack of reciprocals and the employer complaints. The disagreement about the former

16  three went up for review by the Coast Committee. Pls.' Ex. 16. Plaintiffs and their counsel

17  had received no advance notice that their requests would be taken up at July 2008 meeting,

18  Sullivan Decl. in Supp. of Pls.' Opp'n, ¶ 51, and they only learned of the result in an August

19  11, 2008 letter from Local 13, Pls.' Ex. 40.

20         The Coast Committee debated the transfer requests at two meetings, on October 29,

21  2008 and January 22, 2009, where the PMA again disagreed with the Union Defendants'

22  position that the reciprocal transfer rule was part of the "usual rules." According to the

23  October 2009 meeting minutes, the "Employers stated that the transfer provisions in

24  Supplement I provide numerous reasons for which a transfer may be denied. Reciprocity is

25  not a contractually supported reason for denial." Pls.' Ex. 41. The ILWU supported Local

26  13' s position that the LA Port Committee "has historically used reciprocity as a criterion

27  _____

28         [6] Although the parties agree that Stafford was not released, his name is listed among
the seven cleared for transfer by the SF Port Committee in the May 24, 2007 letter.

1   when considering transfers into a port," which is "correct and defensible within the broad

2   guidelines of Supplement I." *Id.*  The discussion was held over for further review.  Both

3   sides reiterated their positions in the January 2009 meeting, where the Union Defendants

4   additionally argued that the SF Port Committee minutes releasing six of the Plaintiffs for

5   transfer did not provide the level of specifity required by Supplement I, a point the PMA

6   disputed.  Pls.' Ex. 42.  However, the Coast Committee concluded that there were no

7   openings available due to a decrease in work opportunities at the LA Port, and the transfer

8   requests of Phillips, Lawton, and Ayala were tabled for later reconsideration.

9        Plaintiffs argue that the Union Defendants have virtually closed off their ability to

10  transfer "from the side," instead satisfying the LA Port's labor demand by drawing from a

11  "nepotism-tinged pool of new workers" who join the registration list "from below."  Opp'n at

12  1.  When Local 13 last selected individuals to become casuals in the LA Port, all registered

13  and some casual workers were given an "industry card"  to pass onto someone interested in

14  applying.  Pls.' Ex. 45, Stipulation Re: 2004 Lottery.  Three-thousand new casual workers

15  were randomly selected from a pool composed of every "industry card" applicant plus an

16  equal number of public applicants.  Plaintiffs point out that since 2004, the Union Defendants

17  have elevated more than 2,000 casuals to the registered list, while simultaneously telling

18  Plaintiffs the list has no opening for them.

19       As "Class A" longshoremen, Plaintiffs are all given the first priority for work and

20  training.  If allowed to transfer their registration to the LA Port, they would bring their

21  seniority with them.  This, Plaintiffs allege, is the primary reason the Union Defendants have

22  "stonewalled" their transfer requests.  Opp'n at 9.  Incoming transfers "with more seniority

23  than members of Local 13 present a threat to the training and work opportunity of such Local

24  13 members," Plaintiffs assert, particularly because the LA Port is "a low seniority port" due

25  to "very quick growth over the last decade or so."  *Id.* at 2-3.

26  //

27  //

28  //

8

**LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The court may not weigh the evidence and must view the evidence in the light most favorable to the nonmoving party. *Id.* at 255.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must "come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Houghton v. South*, 965 F.2d 1532, 1537 (9th Cir. 1992). However, on an issue for which its opponent will have the burden of proof at trial, the moving party can prevail merely by "pointing out to the district court [] that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party meets its initial burden, the opposing party must then "set out specific facts showing a genuine issue for trial" to defeat the motion. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250.

**DISCUSSION**

**I. FIRST CAUSE OF ACTION FOR BREACH OF LMRA SECTION 301 AND THE DUTY OF FAIR REPRESENTATION**

Plaintiffs bring their first claim under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, alleging that the Defendants breached the Agreement and violated their duty of fair representation by blocking Plaintiffs' transfer requests and "failing to fully and fairly represent Plaintiffs in the exercise and enforcement" of their transfer rights. TAC ¶¶ 59-60. Section 301 gives the federal district courts subject-matter jurisdiction over suits

United States District Court

For the Northern District of California

1  alleging "violations of contracts between an employer and a labor organization."  29 U.S.C.

2  § 185(a); *Textron Lycoming Reciprocating Engine Div. v. United Auto., Aerospace & Agric.*

3  *Implement Workers of Am.*, 523 U.S. 653, 656 (1998).  In addition to alleging "a breach of

4  the collective-bargaining agreement" under section 301, Plaintiffs also allege "breach of the

5  union's duty of fair representation, which is implied under the scheme of the National Labor

6  Relations Act."  *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 (1983).  "[A]s a

7  formal matter," the claim therefore "comprises two causes of action," constituting a so-called

8  "hybrid" section 301/fair representation claim.  *Id.* at 164-65.

9       The duty of fair representation is a judicially created doctrine standing "as a bulwark to

10  prevent arbitrary union conduct against individuals stripped of traditional forms of redress by

11  the provisions of federal labor law."  *Vaca v. Sipes*, 386 U.S. 171, 182 (1967); *see also NLRB*

12  *v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 181 (1967) ("It was because the national labor

13  policy vested unions with power to order the relations of employees with their employer that

14  this Court found it necessary to fashion the duty of fair representation.").  "Under this

15  doctrine, the exclusive agent's statutory authority to represent all members of a designated

16  unit includes a statutory obligation to serve the interests of all members without hostility or

17  discrimination toward any, and to exercise its discretion with complete good faith and

18  honesty, and to avoid arbitrary conduct."  *Vaca*, 386 U.S. at 177.  The doctrine provides an

19  "important" but "purposefully limited" "check on the arbitrary exercise of union power," as a

20  "wide range of reasonableness must be allowed a statutory bargaining representative in

21  serving the unit it represents."  *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 374

22  (1990) (internal citations omitted).  A union breaches its duty of fair representation only

23  when its "conduct toward a member of the collective bargaining unit is arbitrary,

24  discriminatory, or in bad faith."  *Vaca*, 386 U.S. at 190.

25       Hybrid section 301/fair representation claims ordinarily arise out of a union's deficient

26  representation in an internal grievance procedure:  the employee brings claims against his

27  employer for breaching the collective bargaining agreement, and against his union for

28  representing him in the internal grievance against the employer "in such a discriminatory,

United States District Court

For the Northern District of California

1  dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation."

2  *DelCostello*, 462 U.S. at 164; *see also Galindo v. Stoody Co.*, 793 F.2d 1502, 1509 (9th Cir.

3  1986) ("The vast majority of duty of fair representation claims arise in the grievance

4  procedure context: the employee claims that a union failed to process a grievance or

5  mishandled its presentation."). Although the employee may "sue one defendant and not the

6  other," "the case he must prove is the same whether he sues one, the other, or both."

7  *DelCostello*, 462 U.S. at 165. "In order to prevail in any such suit, the plaintiff must show

8  that the union and the employer have both breached their respective duties." *Bliesner v.*

9  *Comm. Workers of Am.*, 464 F.3d 910, 913 (9th Cir. 2006).

10     Plaintiffs' claims do not fit that prototype. Indeed, Plaintiffs emphasize that this case

11  "does not involve a grievance, but the substantive merits of a union rule." Opp'n at 13. As a

12  result, Plaintiffs insist that the cases Defendants cite, in which unions' decisions not to

13  pursue grievances were found not to violate the duty, are off point. *Id.* Defendants,

14  similarly, argue that Plaintiffs' reliance on case law regarding unfair labor practices under the

15  National Labor Relations Act (the "NLRA"), rather than the fair representation doctrine, is

16  "fatal." Reply at 4-5. Neither party points the Court to any cases examining an analogous

17  claim. However, the standards governing both section 301 and the fair representation

18  doctrine are well established, and the parties agree that the claim is properly assessed under

19  this hybrid framework.

20

21     **A.      Duty of Fair Representation**

22     The parties agree that Plaintiffs' fair representation claim hinges primarily on the

23  validity of the reciprocal transfer rule. Plaintiffs argue that "*the entire rule* is

24  discriminatory," as it has allegedly been used by Local 13 "to discriminate against members

25  of other ILWU locals in favor of Local 13's Casuals, Class B, and Class A workers." Opp'n

26  at 13 (emphasis in original). Defendants observe in Reply that "Plaintiffs' opposition

27  narrows down to a facial attack" on the reciprocal transfer rule, and therefore argue that

28  summary judgment "turns on a question of law as to the legality of this rule." Reply at 1.

United States District Court

For the Northern District of California

1   Despite this apparent agreement, Plaintiffs' attack goes beyond the substantive validity

2   of the reciprocal transfer rule.  Plaintiffs also allege that Defendants failed "to fully and fairly

3   represent Plaintiffs in the exercise and enforcement of their PCLCD transfer rights," TAC

4   ¶ 60, and they document multiple delays and irregularities in the way the Union Defendants

5   processed their transfer requests.  The Court will therefore address two bases for Plaintiffs'

6   fair representation claim: first, that the rule adopted by the Union Defendants to determine

7   transfer requests is improper on its face; and second, that the Union Defendants violated the

8   duty by failing to adequately consider Plaintiffs' transfer requests.

9   The Union Defendants will only have breached the duty of fair representation for

10   conduct that was "arbitrary, discriminatory, or in bad faith."  *Vaca*, 386 U.S. at 190.

11   Although courts are generally deferential to a union's exercise of judgment, even where that

12   judgment is "ultimately wrong," such deference is lost "where union actions or inactions are

13   'so far outside a wide range of reasonableness that [they are] wholly irrational or arbitrary.'"

14   *Beck v. UFCW, Local 99*, 506 F.3d 874, 879 (9th Cir. 2007) (quoting *Air Line Pilots Ass'n v.*

15   *O'Neill*, 499 U.S. 65, 78 (1991)).  "To establish that the union's exercise of judgment was

16   discriminatory, a plaintiff must adduce 'substantial evidence of discrimination that is

17   intentional, severe, and unrelated to legitimate union objectives.'" *Id.* at 880 (quoting

18   *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Employees of Am. v. Lockridge*, 403

19   U.S. 274, 301 (1971)).  Bad faith requires "substantial evidence of fraud, deceitful action or

20   dishonest conduct."  *Id.* (quoting *Lockridge*, 403 U.S. at 299).

21

22   **1.      Facial validity of the reciprocal transfer rule**

23   Plaintiffs and Defendants agree that the reciprocal transfer rule is designed to protect

24   those longshoremen already working out of the LA Port; they disagree only as to whether

25   that purpose is permissible given the union's duty of fair representation.  Leal Sundet, an

26   elected official with the ILWU, explained that the rule protects the port's incumbent

27   Identified Casual and Class B workers by limiting "expansion of the list of Class A workers

28   who have permanent priority for job dispatch, training, and promotions over all others."

United States District Court

For the Northern District of California

Sundet Decl. ¶ 11.  Observing that the union owes "the same duty of fair representation" to less senior workers as it does to Class A longshoreman, Sundet characterizes the rule as "a modest but appropriate counterbalance" to prevent transfers from "flooding the class A list ahead of them and delaying their dispatch and promotions." *Id.*  Plaintiffs, similarly, argue that the "rule was motivated by the intent to discriminate against Plaintiffs, as members of another ILWU longshore Local, in favor of protecting the training and jobs of Local 13's members and Class B registrants utterly dependent on Local 13 for promotion to Class A status." Opp'n at 14.

The rule will violate the Union's duty of fair representation only if its adoption was "arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190.  Undisputed evidence traces the rule back as far as 1983 and 1972.  Although its genesis is unknown, the Union Defendants offer multiple rationales to justify its utilization, including its objectivity (which avoids subjective case-by-case determinations of transfer requests) and its protection of less-senior workers in the LA Port.  Such rationales are surely not "so far outside a wide range of reasonableness" as to be "wholly irrational or arbitrary." *Beck*, 506 F.3d at 879.  Likewise, Plaintiffs have presented no "evidence of fraud, deceitful action or dishonest conduct" in the adoption of the reciprocal transfer rule, as would be necessary for a finding of bad faith.  *Id.*

Plaintiffs also argue that the reciprocal transfer rule constitutes discrimination based on their membership in a longshore local other than Local 13.  Discrimination violates the duty of fair representation if it is "intentional, severe, and unrelated to legitimate union objectives." *Beck*, 506 F.3d at 879.  Unions are not, however, barred from differentiating among classes of workers.  "[T]he law of fair representation clearly permits a union to negotiate for and agree to contract provisions involving disparate treatment of distinct classes of workers . . . as long as such conduct is not arbitrary or taken in bad faith." *Williams v. Pacific Maritime Ass'n*, 617 F.2d 1321, 1330 (9th Cir. 1980).

Both Local 13 and Local 10 differentiate Class A workers who rose to that status within the home port from those who attained it elsewhere.  The reciprocal transfer rule has protected Plaintiffs' seniority on the SF Port registration lists, in the same way that it

13

United States District Court

For the Northern District of California

1  preserves that of longshoremen at the LA Port.  Plaintiffs cannot therefore argue that the rule

2  – which has protected them in the same way it protects Local 13 members – is

3  discriminatory.  Although Local 13's reciprocal transfer rule may "discriminate" against

4  members of Local 10 and other locals, Local 10's reciprocal transfer rule has the same effect

5  on members of Local 13.  The reciprocal transfer rule is a permissible means of

6  differentiating among classes of employees, and does not, as a matter of law, violate the

7  union's duty of fair representation.

8       Plaintiffs have failed to put forth sufficient evidence showing that the reciprocal transfer

9  rule is arbitrary or discriminatory, or that it was adopted in bad faith.  Plaintiffs' contention

10  that the reciprocal transfer rule violates the duty of fair representation cannot survive

11  summary judgment.

12

13            **2.**         **The Union Defendants' consideration of the transfer requests**

14       The Court's inquiry does not end there, however.  Plaintiffs have also put forth evidence

15  suggesting the Union Defendants processed their transfer requests in a manner that violated

16  the duty of fair representation, even if the reciprocal transfer rule that ultimately governed

17  their decisions is valid.  More than a year went by between Local 10's May 24, 2007 letter

18  notifying Local 13 that the seven Plaintiffs had been cleared for transfer, and the LA Port

19  Committee's July 2008 decision on their request.  The Union Defendants claim the delay was

20  caused by a series of errors, including confusion over whether Plaintiffs' transfer was already

21  under review based on a 2005 request, and whether they had in fact obtained Local 10's

22  clearance.  Even so, once the Coast Committee forwarded Plaintiffs' letter complaining of

23  the LA Port Committee's silence back to that committee, another eight months passed with

24  no action.  The standstill only ended when the Coast Committee wrote the LA Port

25  Committee reminding it of its contractual obligation to consider the transfers.

26       Plaintiffs also complain about the absence of clear standards governing transfer

27  requests.  Although reciprocal transfer is a bright-line rule, the standard for "owe-me" and

28  hardship transfers is not.  Multiple Plaintiffs cite family and medical issues that could, in

United States District Court

For the Northern District of California

1  theory, be grounds for a hardship transfer:  Linarez and Phillips both have autistic children

2  for whom Los Angeles offers better child care options, and the asthma symptoms of Ayala's

3  son improved markedly after leaving San Francisco.  However, there are no rules dictating

4  how to apply for such a transfer, or what standards will be applied.

5       Finally, whether or not the reciprocal transfer rule is even properly part of the "usual

6  rules" under the Agreement is a matter of internal dispute within the LA Port Committee and

7  the Coast Committee.  Although the Agreement requires that each Port Committee, by

8  "applying the usual rules," determine whether there are any openings for transfers, the PMA

9  employers and the Union Defendants disagree as to what the "usual rules" are.  The

10  employers disavowed the reciprocal transfer rule and would have approved three of the

11  Plaintiffs' transfer requests; the Union Defendants, however, cited the reciprocal transfer rule

12  as a basis for denial.  This conflict leaves Plaintiffs with no clear guidance as to what

13  standards are applied to decide transfer requests.

14       Such irregularities in the handling of Plaintiffs' transfer requests, and in the

15  promulgation of standards governing transfers, are sufficient to bar summary judgment as to

16  the Union Defendants' duty of fair representation.  It is possible Plaintiffs could prevail on

17  their fair representation claim based not on the substantive integrity of the reciprocal transfer

18  rule, but on the irregular processing of Plaintiffs' transfer requests.  Whether or not the

19  absence of standards for hardship transfers, the uncertain applicability of the reciprocal

20  transfer rule, and the delay in considering Plaintiffs' requests fall outside the permissible

21  range of reasonableness are questions for a jury to decide.  A jury may likewise consider, if

22  the evidence allows, whether the Union Defendants' conduct was discriminatory or in bad

23  faith.  Plaintiffs have, at the very least, raised disputed questions of material fact that

24  preclude summary judgment for the Union Defendants on the duty of fair representation.

25

26  **B.  Breach of the Collective Bargaining Agreement**

27       The section 301 component of Plaintiffs' hybrid claim requires proof that the employer

28  — here, the PMA —  breached the Agreement.  Plaintiffs argue that PMA breached

15

United States District Court
For the Northern District of California

1   provisions of the Agreement that bar discrimination based on union membership or the lack

2   thereof, and that prohibit "favoritism or discrimination in the hiring or dispatching or

3   employment of any longshoremen qualified and eligible under the Agreement." Agreement,

4   §§ 8.43, 13.1.

5   Plaintiffs have offered sufficient evidence of the Agreement's breach to preclude

6   summary judgment.  The LA Port Committee had a "contractual obligation to address the

7   requests," as acknowledged in the June 2008 letter from the Coast Committee, and its refusal

8   to do so over the span of eight months may have breached that obligation.  It is also possible

9   a jury could find the committee's actions violate the Agreement's prohibition against

10  "favoritism or discrimination."  Since the committee's membership is split between the PMA

11  and Local 13, any contract breach by the committee is appropriately attributed to the

12  employers and union alike.  Plaintiffs have raised a triable issue as to the Agreement's breach

13  by the PMA.

14  Summary judgment is therefore DENIED as to the first cause of action for breach of

15  section 301 and the duty of fair representation.

16

17  **C.   Claims by Plaintiffs Linares, Torres, Whitten, and Stafford**

18  Defendants point out that the transfer requests of three Plaintiffs were denied on a basis

19  independent of the reciprocal transfer rule, and argue that summary judgment is therefore

20  appropriate as to them.  In considering the transfer requests of Plaintiffs Linares, Torres, and

21  Whitten, the PMA concluded that they were not eligible due to outstanding employer

22  complaints.  Section 1.3 of Supplement I bars from transfer any longshoreman "who within a

23  year of the application has been the subject of major discipline."  Plaintiffs, however, dispute

24  that employer complaints barred these transfers; they argued at hearing that whether the

25  disciplinary actions could be characterized as "major," and whether they had occurred within

26  a year of the transfer applications, are both triable issues of fact.  The Court agrees.

27  In addition, Plaintiff Stafford had not been released for transfer by the SF Port

28  Committee, a prerequisite to transfer required by section 1.11.  However, Stafford was listed

16

United States District Court

For the Northern District of California

1    among all seven Plaintiffs as having been cleared by Local 10 for transfer in a May 2007

2    letter.  Stafford's failure to secure Local 10's release cannot, therefore, be a basis for ruling

3    against him as a matter of law.

4

5    **II.    SECOND CAUSE OF ACTION: SECTION 101(A)(1) OF THE LMRDA**

6            Plaintiffs' second cause of action alleges that Defendants violated section 101(a)(1) of

7    the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a)(1),

8    which mandates that "[e]very member of a labor organization shall have equal rights and

9    privileges within such organization[.]"  Defendants argue that the LMRDA is inapplicable

10   because Plaintiffs are not even "members" of Local 13.  Both sides agree that the question is

11   governed by *Parish v. Legion*, 450 F.2d 821 (9th Cir. 1971).  The protections of the LMRDA

12   apply to "'anyone who has fulfilled all of the requirements of membership,'" and are not

13   limited "to those persons who have been formally admitted to membership in a labor

14   organization and who are recognized as members by that organization." *Id.* at 824 (quoting

15   LMRDA § 3(o)).  The question must be resolved, as the Ninth Circuit did in *Parish*, by

16   examining the ILWU Constitution "to determine whether it grants a local discretionary

17   power to refuse the rights of membership to travelers seeking to transfer their membership."

18   *Id.* at 825.

19           Article XVII of the ILWU Constitution, which governs transfers, provides in Section 5

20   that the "rights, rules and procedure for transfer shall be determined by the respective

21   industry divisions of the union."  The Constitution prohibits any member from transferring

22   "more than once a year" (Section 1) or before hitting three years of membership in a local

23   (Section 2), and it requires a member to first "secure a clearance from his/her own local"

24   before submitting "a letter to the local he/she wishes to transfer to" (Section 3).  Once

25   accepted for transfer, a member "shall not be required to pay an initiation fee" (Section 4).

26           Supplement I of the Agreement sets out the conditions under which a "longshoreman

27   may transfer to another port."  Agreement, Supp. I, § 1.1.  The Port Committee at the

28   transferee's former port must first conclude "that a transfer is warranted," and may deny the

United States District Court

For the Northern District of California

request "if the longshoreman is needed at that port or if he has not had a satisfactory record" there. *Id.* §§ 1.11, 1.2.  The JPLRC of the new port has to find an opening available and approve the transfer "by applying the usual rules." *Id.* § 1.13.  Supplement I explicitly provides that a transfer request "may be denied" by the new port's JPLRC, and mandates that any such denial "shall be subject to review in accordance with the procedure and rules that are applicable," unless the denial was "because there is no opening available on its list." *Id.* § 1.4.  Transfers "shall not be permitted if contrary to policies established by" the JCLRC, and longshoremen subject to "major discipline" in the prior year are ineligible to transfer. *Id.* §§ 1.12, 1.3.

Plaintiffs read both the Constitution and the Agreement as giving them "a clearly stated right to a transfer." TAC ¶ 37.  However, the plain language of both documents suggests otherwise.  The Constitution allows industry divisions to determine the "rights, rules and procedure for transfer," and the Agreement sets up numerous junctures at which a request could be denied.  Although Plaintiffs point out that no such industry division rule has been produced, that is inconsequential: the Constitution cannot guarantee transfer as of right if it authorizes a division to determine what those rights are.  Whereas the constitution in *Parish* provided that the financial secretary "shall grant" the transfer to a member in good standing, 450 F.2d at 826, the ILWU Constitution contains no such mandate.  Plaintiffs are not Local 13 members, nor can they demonstrate that they have fulfilled all of the requirements of membership in Local 13.

Summary judgment is therefore GRANTED to the Union Defendants as to the second cause of action under section 101(a)(1) of the LMRDA.

## III.  THIRD CAUSE OF ACTION: FAIR PROCEDURE DOCTRINE

Local 13 argues that the state law claims raised in Plaintiffs' third cause of action are preempted by federal law.  Plaintiffs allege in their third claim that Local 13 "exercises monopoly power over a significant industry that affects the public interest and, as such, is precluded from acting arbitrarily in excluding qualified longshoremen from other ports in

California from working the Ports of Los Angeles and Long Beach." TAC, ¶ 74. Local 13 observes that this claim "appears to allege a violation of the California common law doctrine of fair procedure, which applies to private organizations that affect the public interest." Mot. at 19. Plaintiffs do not dispute this characterization. Indeed, the authority cited in the TAC is *James v. Marinship Corp.*, 25 Cal. 2d 721 (1944), in which the California Supreme Court relied on "the general principles underlying" the fair procedure doctrine to hold that "a union could not arbitrarily deny full membership privileges to African-American workers." *Potvin v. Metro. Life Ins. Co.*, 22 Cal. 4th 1060, 1063-64 (2000); TAC, ¶ 74. The Court therefore construes the third cause of action as a claim under California's common law fair procedure doctrine.

The fair procedure doctrine "protects against arbitrary decisions by private organizations under certain circumstances." *Palm Med. Group, Inc. v. State Comp. Ins. Fund*, 161 Cal. App. 4th 206, 215 (2008). It applies "primarily to decisions affecting membership in private organizations that affect the public interest, particularly when there are 'substantial economic ramifications' from exclusion," and bars such entities from expelling or excluding "qualified persons without acting in a manner that is substantively rational and procedurally fair." *Id.* An entity's duty to comply with the right to fair procedure arises if it "possesses sufficient market power that exclusion significantly impairs the practice of the applicant's profession or affects a substantial economic interest." *Id.* at 219.

Local 13 raises no arguments as to the substantive merits of the fair procedure claim, asserting only that it is preempted by federal law. Local 13 identifies two bases for preemption. First, section 301 of the LMRA preempts any state law action between an employer and union that would require interpretation of a collective bargaining agreement. Where "the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement," state law is preempted in favor of "federal labor-law principles." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405-06 (1988). Second, no state may regulate conduct that is arguably protected or prohibited by the NLRA. *Bldg.*

19

United States District Court
For the Northern District of California

1  *Trades Council v. Garmon*, 353 U.S. 236, 244 (1959).

2      Plaintiffs' fair procedure claim hinges on whether the denial of Plaintiffs' requests to

3  transfer to Local 13 was substantively rational and procedurally fair.  Since the procedures

4  governing that decision are set forth in the collective bargaining agreement, this claim will

5  hinge on the interpretation of the Agreement.  Section 301 preempts claims "substantially

6  dependent on analysis of a collective-bargaining agreement."  *Cramer v. Consol.*

7  *Freightways, Inc.*, 255 F.3d 683, 689 (9th Cir. 2001).  This state law claim is therefore

8  preempted by section 301, and summary judgment is GRANTED to Local 13 on Plaintiffs'

9  third cause of action.

10

11  **IV.  FOURTH CAUSE OF ACTION: FOR INJUNCTION**

12      Plaintiffs' fourth cause of action "for injunction to preserve seniority rights" does not

13  state a claim on which relief can be granted.  It is, as Defendants argue and Plaintiffs never

14  rebut, merely a request for relief and not an independent cause of  action.  *See Mulato v.*

15  *WMC Mortg. Corp.*, No. C 09-03443 CW, 2009 U.S. Dist. LEXIS 100070, at *23 (N.D. Cal.

16  Oct. 27, 2009) (dismissing claim for injunctive relief "because injunctive relief is a remedy,

17  not a cause of action").  Summary judgment is GRANTED to the Union Defendants as to the

18  fourth cause of action.

19

20  **CONCLUSION**

21      For the foregoing reasons, summary judgment is DENIED as to Plaintiffs' first cause of

22  action, and GRANTED as to the second, third, and fourth causes of action.

23      Accordingly, a case management conference will be held on Monday, December 7,

24  2009, for the purpose of setting dates for the pretrial conference and trial.  The parties shall

25  //

26  //

27  //

28  //

20

1  meet and confer and submit a joint case management statement on or before Monday,

2  November 30, 2009.

3

4  **IT IS SO ORDERED.**

5

6  Dated: 11/05/09

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California