IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOSE AYALA, et al.,

                        Plaintiffs,

            v.

PACIFIC MARITIME
ASSOCIATION, et al.,

                        Defendants.

NO. C08-0119 TEH

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

        This matter came before the Court for a bench trial on October 26, 2010, through
November 3, 2010, on Plaintiffs' claim under § 301 of the Labor Management Relations Act,
29 U.S.C. § 185 *et seq*. Plaintiffs' claim is a hybrid breach of contract/breach of the duty of
fair representation claim. They seek compensatory damages, declaratory relief, injunctive
relief, and attorneys' fees. The parties filed their proposed findings of fact and conclusions of
law by January 19, 2011, and the Court heard closing arguments on January 31, 2011.
Having carefully considered all of the evidence and testimony adduced at trial, the parties'
oral and written submissions, and the entire record herein, the Court finds as follows.

**FINDINGS OF FACT**

        Plaintiffs, seven longshoremen registered in the ports of San Francisco and Oakland
("SF Port"), seek transfers to the ports of Los Angeles and Long Beach ("LA Port").
Defendants are the International Longshore and Warehouse Union ("ILWU") and its Local
13 ("Local 13") (collectively, "Defendants"). The Pacific Maritime Association ("PMA"),
the collective bargaining representative of companies employing longshoremen, has been
dismissed as a defendant in this case. At trial, Plaintiffs sought to prove that PMA breached
the collective bargaining agreement and that Defendants breached their duty of fair

United States District Court

For the Northern District of California

1    representation.

2

3    **I. Union/Port Organization and Rules Governing Transfer Requests**

4            The Pacific Coast Longshore Contract Document (the "Agreement") is the collective

5    bargaining agreement governing wages, hours, and terms of employment for West Coast

6    longshoremen represented by the ILWU and employed by PMA member companies. The

7    Agreement covers a single coastwise bargaining unit consisting of all registered and casual

8    longshoremen and marine clerks employed by PMA member employers. Defendant ILWU is

9    certified as the exclusive bargaining agent for this unit. Defendant Local 13 is the designated

10   representative of longshore workers employed in the LA Port. Local 10 of the ILWU ("Local

11   10") is the designated representative of longshore workers employed in the SF Port. Every

12   port covered by the Agreement falls under the jurisdiction of a Joint Port Labor Relations

13   Committee ("Port Committee") comprised of representatives from PMA employers and the

14   port's ILWU-affiliated local union. Each Port Committee, in turn, is subject to the control of

15   the Joint Coast Labor Relations Committee ("Coast Committee"), whose membership is

16   drawn from the highest levels of PMA and the ILWU.

17           Every Port Committee maintains a list of "registered" and "identified casual" workers

18   and operates a hiring hall where those longshoremen obtain work. Jobs are disseminated by

19   seniority and local dispatch rules. The first preference is given to "Class A" or "fully

20   registered" longshore workers, who have the most experience and training. Second priority

21   goes to "Class B" longshoremen, who are junior or apprentice workers with "limited

22   registration." Local dispatch rules might differ, but generally jobs are made available to

23   identified casuals only after all available registered workers have been dispatched. The Coast

24   Committee elevates Class B workers to Class A status, and identified casuals to Class B

25   status, based upon Port Committee recommendations that examine manpower needs, a

26   longshoreman's time worked, and other eligibility requirements. Both Local 13 and Local 10

27   require that a longshore worker attain Class A registered status before becoming a member of

28   the union.

United States District Court
For the Northern District of California

2

United States District Court

For the Northern District of California

Longshore workers registered at one port who wish to work in another port have three ways of doing so – volunteering "off the floor," becoming an "authorized visitor," and transferring. Volunteers off the floor are dispatched after all registered longshore workers and ahead of casuals. Authorized visitors are dispatched based upon local dispatch rules and their seniority at their home port, and they are accepted by the Port Committee to work for a limited period of time. In the LA Port, authorized visitors are allowed to work for three thirty-day periods per year. This ninety-day limit was not always strictly enforced.

Only fully registered Class A longshore workers are eligible to transfer from one port to another, and securing a transfer is these longshoremen's only means of working in another port on a permanent basis. That is, Class A longshoremen cannot resign their home port registration and sign on as a casual in another port. Transfer is their only option, and Class A members "may transfer to another port . . . provided" that three main conditions are met. Pacific Coast Longshore Contract Document, Supp. I, § 1.1 [hereinafter "Agreement"]. First, the Port Committee for the port from which the longshore worker seeks transfer must approve the transfer; second, the transfer must not be contrary to Coast Committee policy; and third, the Port Committee for the port to which the longshore worker seeks transfer must approve the transfer. *Id.* at §§ 1.11-1.13. This last condition is satisfied if the Port Committee for the port to which the worker seeks transfer, "by applying the *usual rules* finds there is an opening available for him on the list of such port and approves him for transfer of registration." *Id.* at § 1.13 (emphasis added).

The "usual rules" are not defined in Supplement I. They have been understood by the LA Port Committee to denote the "reciprocal transfer rule."[1] The reciprocal transfer rule requires a Class A longshore worker seeking to transfer to the LA port to swap places with a Class A longshore worker from the LA Port. This rule appears in LA Port Committee minutes dating back to 1972. For example, in March 1972, the employers "stated that in order to transfer to another port, a man must have someone who is willing to transfer with

_____

[1] The reciprocal transfer rule is not unique to the LA Port. Local 10 applies it also.

him to the port that he is leaving." Defs.' Ex. S. In September of that year, the employers "stated they cannot agree to [a longshore worker's] request to transfer until [he] has a reciprocal transfer." Defs.' Ex. T. The LA Port Committee approved a reciprocal transfer in 1979, Defs.' Ex. U, and on November 16, 1983, in the course of voting to deny a transfer, PMA representatives "stated the 'usual rules' . . . are that individuals have not been allowed to transfer into the Port of Los Angeles-Long Beach on a nonreciprocal basis." Defs.' Ex. W. Port Committee rulings "remain in effect" unless they are changed or modified by the Agreement. Agreement § 24.3. No provision of the Agreement concerning voluntary transfers has been changed or modified since November 16, 1983.

Supplement I contains other rules regarding transfers. The Port Committee for the port from which a longshore worker seeks transfer may deny the transfer "if the longshoreman is needed at that port or if he has not had a satisfactory record at that port." *Id.* at Supp. I, § 1.2. "No longshoreman shall be eligible for transfer who within a year of the application has been the subject of major discipline." *Id.* at § 1.3. The Port Committee for the port to which a longshore worker seeks transfer may deny the transfer, but "[a]ny denial of transfer [by this Port Committee], except because there is no opening available on its list, shall be subject to review in accordance with the procedure and rules that are applicable." *Id.* at § 1.4. Class A workers are not eligible for transfer until they have held this status for one year. A transferring longshore worker's seniority at the port to which he transfers is determined relative to the seniority of the Class A members at his new port.

Two other kinds of transfers have been approved: "owe-me" transfers and hardship transfers. The owe-me transfer is a variation on the reciprocal transfer – it allows delayed reciprocation. That is, where owe-me arrangements are in place, a local that sends a transferring longshoreman to another port must save a spot for a longshore worker from the port that accepted the worker. No more than one spot can be owed or saved at a given time. Local 8 (Portland) and Local 13 negotiated an owe-me arrangement sometime between 2000 and 2002. Two owe-me transfers from Seattle (Local 19) to the LA Port have been approved

United States District Court

For the Northern District of California

by the Local 13 Executive Board, one in 1999 and another in 2002.[2] In 2004, the LA Port Committee approved the transfer of a Local 13 member to Portland on an owe-me basis. When asked if there had ever been an owe-me arrangement between Local 13 and Local 10, Tim Podue ("Podue"), a member of Local 13's Executive Board, said he was "sure there has been." Trial Tr. vol. IV at 577:2. He was not aware of a current owe-me arrangement between these locals, and no other witness testified to such an arrangement. Local 13 does not keep written records of the status of owe-me transfers, and has not done so since at least 1998.

The LA Port Committee has also allowed longshoremen to transfer on a hardship basis. These longshoremen have not always been required to adhere to the reciprocal rule. Hardship transfers are evaluated on a case-by-case basis. The Agreement is silent regarding the criteria for hardship transfers, as are Port and Coast Committee minutes and internal union and PMA documents. Hardship transfers have been granted to longshore workers on the basis of the worker's health needs, the care needs of the worker's family, a worker's divorce, and personal legal problems.

Local 13 requires hardship transfer requests to go before Local 13's Executive Board. In May 1999, the Local 13 Executive Board approved a Seattle longshoreman's transfer to the LA Port on the basis of both hardship and owe-me. In January 2000, the Local 13 Executive Board approved a longshoreman's hardship transfer to the LA Port on the strength of his personal legal issue. The following month, in February 2000, the Local 13 Executive Board approved a hardship transfer for a Seattle longshore worker with sleep apnea. Two years later, in February 2002, the Local 13 Executive Board approved a medical hardship transfer for a Seattle longshoreman. This was the most recent hardship transfer into the LA Port and it was also approved on an owe-me basis.

---

[2] These transfers were also approved on a hardship basis.

**II. Plaintiffs' Visiting and Transfer Requests**

Plaintiffs are seven Class A longshoremen registered in the SF Port and represented by Local 10. Each sought to transfer his registration to the LA Port in 2002 or thereafter, and they did so for a variety of reasons. Jose Ayala ("Ayala") testified that his son's asthma required treatment with prednisone and a nebulizer machine until the family moved to Southern California. Leroy Phillips ("Phillips") has two daughters with asthma and a son who is severely autistic. His son is primarily cared for by his wife, and the family moved to Southern California in 1998, after a storm destroyed the roof of his home in Sacramento. Joseph Lawton ("Lawton") moved to Los Angeles in 2001 because he was in the music industry and because he believed he could get more skilled jobs in the LA Port. He had entered the longshore industry planning to transfer to the LA Port. Jose Linarez ("Linarez") wanted to transfer to the LA Port and live in Los Angeles to be near his sister, a nurse, who would care for his autistic and mentally retarded son. Gonzalo Torres ("Torres") was raised in Southern California, where his children live. Kimani Stafford ("Stafford") sought a transfer to move away from his ex-wife, who he says harassed him and hired a hit man to kill him. Deandre Whitten ("Whitten") purchased a home near Los Angeles in June 2004, and when his mother went into a coma later that year, she was transferred to a facility in the San Fernando Valley.

Much of the conduct Plaintiffs challenge involves their transfer requests. However, Ayala and Lawton also allege that they were mistreated when they attempted to work in the LA Port as visitors. The Court will recount their experiences as visitors before turning to Plaintiffs' transfer requests.

**A. Visiting**

Until late 2002, Ayala and Lawton worked in the LA Port as visitors without any restriction on the number of days they could work. A contract dispute led to a lockout that continued until mid-2003. During the lockout, visitors were sent back to their home port. When the LA Port opened up to visitors in 2003, Ayala found it difficult to get night work,

which Ayala preferred and is more lucrative. Harry Dong ("Dong"), Local 13's Secretary-Treasurer, explained to Ayala that visitors to the LA Port could not work nights unless the visitor's home port allowed Local 13 members to do the same. Ayala gave Dong a letter from Local 10's president assuring him that Local 13 members could get night work as visitors to the SF Port.[3] Dong said the letter was insufficient and that he needed to see meeting minutes. Ayala gave him Local 10 Executive Board minutes. Dong said he needed minutes of the Local 10 membership meeting. Ayala produced them. Dong said he would address the issue and let Ayala know. He never got back to Ayala.

Lawton felt that his privileges as a visitor changed after February 2004, when Local 10 member Lee Lindenberg filed suit against Local 13. Before the suit, Lawton and Lindenberg had often sought visiting privileges from the Local 13 Executive Board at the same time. After Lindenberg's suit, Lawton and others[4] were not allowed to work as a visitor. The reason, a Local 13 executive board member told Lawton, was that "one bad apple spoils the bunch." Trial Tr. vol. III at 391:1.

Defendants concede that their policy regarding visitors changed around this time. However, according to Mike Freese ("Freese"), a Local 13 Executive Board member who has held many leadership positions in Local 13, the reason for the change was that new executive board members began reading the dispatch rules and the International constitution and discovered the rule limiting visiting privileges to three thirty-day terms per year.

**B. Transfers**

Ayala, Lawton, and Phillips began seeking transfers to the LA Port in 2002. They signed on to a list of ninety-two Class A longshoremen from Local 10 seeking to transfer to

---

[3] The leadership of Local 8 sent a similar letter to the president of Local 13 in 2002. The letter verified Local 8's policy of allowing Local 13 visitors to work nights and its understanding that by doing so, Local 13 would extend the same privileges to Local 8 members. The Court heard no evidence regarding whether this letter led to Local 8 members getting night work at the LA Port.

[4] Lawton does not identify who else was not allowed to work as a visitor.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

Local 13. Local 10's president wrote to the LA Port Committee in November 2002 requesting that the committee accept these longshore workers for transfer. The Coast Committee denied these transfers in April 2003, and the LA Port Committee denied them the following month.

While their requests were pending as part of the list of ninety-two, Ayala, Lawton, and Phillips began working on hardship transfers. Minutes show that the SF Port Committee began discussing these requests, and the reasons Plaintiffs sought to transfer, in 2002.  At initial SF Port Committee meetings, PMA resisted the idea of a hardship transfer. In 2003, PMA stated that it did not recognize hardship transfers. At a meeting in 2005, Local 10 reported that Local 13's President had verbally approved Ayala, Lawton, and Phillips' transfer requests. Soon after a SF Port Committee meeting on March 29, 2007, the committee determined that all Plaintiffs except Stafford could petition Local 13 for transfer. Linarez, Stafford, and Torres attended this meeting.

While this process before the SF Port Committee was underway, some Plaintiffs approached Local 13 leaders about the possibility of a transfer. In 2002 or 2003, Ayala sought out Mondo Porras ("Porras"), Local 13's secretary-treasurer at the time. He told Porras he was interested in transferring his registration to the LA Port, and asked Porras what he needed to do. Porras told Ayala that he needed a reciprocal transfer. Ayala responded by saying that he had heard that some ports did not require a reciprocal transfer. Porras explained that Local 13 has owe-me arrangements with some ports. Ayala asked if the same arrangement could be made with Local 10. Porras said no, "we can't do that." Trial Tr. vol. I at 51:25-52:1. "[I]t won't work," he said. *Id.* at 116:6.

While Ayala, Lawton, and Phillips were waiting outside a Local 13 Executive Board meeting in 2004 or 2005, attempting to check in as visitors, Ayala heard Local 13 Executive Board Member Podue say that he would "flood the fucking hall before [he] let any of them transfer." Trial Tr. vol. I at 64:15-16. Ayala overheard this statement as part of a yelling match that lasted for five or ten minutes. At another Local 13 Executive Board meeting,

Lawton heard Podue shout that he did not give a damn about Local 10 or other locals. After Podue made this statement, the executive board extended Lawton's visiting privileges.

During this same time period, Whitten approached Dong, a Local 13 leader, and asked Dong how he should go about getting a hardship transfer. Dong responded by asking Whitten what local he was from. Whitten told Dong that he was from Local 10, and Dong said that Local 13 was not taking any transfers. When Whitten pressed Dong about the possibility of a hardship, Dong said, "Brother, it's not going to happen," and walked away. Trial Tr. vol. II at 319:4-5.

In September 2005, Ayala, Lawton, Phillips, and other longshoremen wrote a letter to the Coast Committee and copied the letter to Local 13. The letter stated,

> [w]e are fully registered Class A members of Local 10, that have been looking for transfer into Local 13 for several years now. We have asked the union officers of both locals about the procedures that we need to follow for transfer requests. Unfortunately, we followed these procedures – and as of this date – never received an official answer to our request.

UF # 46. The letter stated that if the authors did not receive a response within 45 to 60 days, they would bring the matter to the NLRB's attention and retain counsel. They did not get a written response. Ayala called the ILWU several times in an attempt to speak with members of the Coast Committee. He finally spoke with Joe Wenzl ("Wenzl"), a Coast Committee member, in November 2005. Wenzl had not read the letter, but asked Ayala to give him a week to get back to him in writing. Ayala did not hear from Wenzl, and in December 2005, Ayala left a phone message for Wenzl. Wenzl did not return Ayala's call. Ayala also spoke with Coast Committee Member Ray Ortiz in January 2006. Ortiz told Ayala that he would call Ayala back after Ortiz read the September 2005 letter. Ortiz did not call Ayala back.

In 2005 or 2006, Lawton and Phillips approached Mark Mendoza ("Mendoza"), the incoming president of Local 13, about hardship transfers. Mendoza said he would see what he could do and changed the subject. Mendoza did not report back to Lawton or Phillips.

In 2007, Whitten visited Frank Ponce de Leon ("Ponce de Leon"), the secretary-treasurer of Local 13, in his office. Whitten asked Ponce de Leon whether there was "any

United States District Court

For the Northern District of California

1  problem" between Local 10 and Local 13. Trial Tr. vol. II at 321:22. Ponce de Leon said,

2  "Brother, let me give you a little history." *Id.* at 321:24-25. Ponce de Leon told Whitten that

3  years ago, when San Francisco had more longshore work than Los Angeles, Ponce de Leon's

4  father and uncle came back in tears from the SF Port after being denied jobs. Ponce de Leon

5  told Whitten that times had changed and that different people were involved now. "But it still

6  hurts," Ponce de Leon said. *Id.* at 322:8. During this conversation, Ponce de Leon used the

7  term "bad blood." *Id.* at 322:10.

8         In May 2007, two months after the SF Port Committee determined that all Plaintiffs

9  but Stafford could petition Local 13 for transfer, Local 10's secretary-treasurer faxed to

10  Local 13 the SF Port Committee minutes reflecting this action. After reviewing these

11  minutes, Ponce de Leon contacted Local 10's president regarding another issue. During that

12  conversation, Ponce de Leon mentioned that transfers from Local 10 need to be reciprocal.

13  Soon after this conversation, Local 10's secretary-treasurer wrote a letter to Ponce de Leon

14  stating that all seven Plaintiffs were seeking transfer to Local 13 and asked Local 13 to

15  address their transfers at the next LA Port Committee meeting. Ponce de Leon consulted with

16  Dong, Local 13's previous secretary-treasurer and asked Dong if a group of individuals had

17  ever been granted transfers without reciprocals. Dong referred Ponce de Leon to the

18  September 2005 letter from Ayala, Lawton, and Phillips to the Coast Committee. Ponce de

19  Leon discussed the matter with Ortiz, and determined that Plaintiffs' transfer requests were

20  defective because they did not indicate that Plaintiffs had secured reciprocal transfers.[5] Ponce

21  de Leon did not respond to Local 10's letter nor did he place Plaintiffs' transfer requests on

22  the LA Port Committee agenda.

23         The Local 13 Executive Board discussed Plaintiffs' transfer requests at their May 24,

24  2007 meeting. Freese, who was Local 13's LA Port Committee representative at the time,

25  told the board that Ayala had asked to appear on the LA Port Committee agenda. Freese said

26  that he had told Ayala that "Local 13 had a protocol to be followed which included reciprocal

27  _____

28      [5] Plaintiffs note that Ponce de Leon had participated in the approval of a non-reciprocal transfer in 2002.

transfers," and that Ayala had asked Freese where this protocol could be found in the Agreement. Pls.' Ex. 68. Freese stated that the SF Port Committee had released Plaintiffs for transfer, that Ayala's appeal to the Coast Committee had been denied, and that Freese expected litigation. Local 13's President Mike Mitre ("Mitre") said that an ILWU member of the Coast Committee had told him that Local 13 could send Plaintiffs back to the SF Port. Podue stated that Local 13 did not have to grant Ayala another thirty-day travel card.

Ayala had several exchanges with Freese in June 2007. Ayala called Freese's office and spoke with his administrative assistant. Ayala asked that Plaintiffs' transfer requests be placed on the LA Port Committee agenda. Freese responded shortly thereafter with a voice mail message. He stated that no item could be placed on the LA Port Committee agenda without Local 13's officers' approval. His tone was hostile:

> Good morning this is Mike Freese from Local 13, I'm one of the [LA Port Committee] reps and this call is for Jose Ayala. I just want to inform you brother that our office staff does not have the authority to put people on the agenda without officers' approval for any [LA Port Committee meeting]. So, for you to try to bypass the officers and speak to my secretary will do you no good. I spoke to some of the other members from your Local and talked to our officers. We will address this issue, but it's not going to help you by trying to bypass our officers by going behind our backs and get on the [LA Port Committee agenda]. Just to let you know brother. Bye.

Pls.' Ex. 69. Ayala called Freese back. He asked Freese why Local 13 would not place his transfer request on the LA Port Committee agenda. Freese said that transfers had to be reciprocal, and that before Ayala could appear before the LA Port Committee, he had to participate in a process of review that started at the Local 13 level. Specifically, Freese told Ayala that Ayala would have to come before the Local 13 Executive Board, and that if the executive board accepted Ayala's transfer request it would be presented to Local 13's membership before being presented to the LA Port Committee. Ayala told Freese that he believed that the Agreement gave him the right to appear before the LA Port Committee.

Ayala played the tape of Freese's voice mail for Whitten, who called Ponce de Leon in an attempt to have his transfer request put on the LA Port Committee agenda. Ponce de

11

Leon explained that longshore workers seeking to transfer to Local 13 needed to appear before the executive board. Whitten disagreed, saying "we feel it's the [LA Port Committee's] issue]." Trial Tr. vol. II at 323:12.

Plaintiffs did not take their transfer requests to the Local 13 Executive Board. In July 2007, they wrote a letter to Ponce de Leon asking Local 13 to either address their transfer requests at the next LA Port Committee meeting or provide a written explanation of why it refused to do so. Ponce de Leon contacted PMA and put Plaintiffs' transfer requests on the agenda. Ponce de Leon soon removed Plaintiffs' transfers from the agenda at PMA's urging because the agenda was large enough and without a reciprocal the committee would not entertain Plaintiffs' requests.

Plaintiffs appealed to the Coast Committee by letter in September 2007. They stated that they had not gotten a response to their July 2007 letter to Ponce de Leon and asked the Coast Committee to conduct a hearing. The Coast Committee considered Plaintiffs' transfer requests at its September 27, 2007 meeting. The committee agreed that (1) the transfer requests remained pending at the SF and LA Port Committees; (2) those Plaintiffs released by the SF Port Committee could seek approval of their transfers by the LA Port Committee; and (3) Plaintiffs not yet released by the SF Port Committee must address their requests to the SF Port Committee. In a letter to Plaintiffs in October 2007, ILWU's counsel explained that transfer requests must be "processed and decided by the local parties involved" and that the Coast Committee would forward Plaintiffs' letter to PMA and Local 13. UF # 61.

At a Local 13 Executive Board meeting in October 2007, Freese made a report to the board regarding Plaintiffs' transfer requests. He explained that seven Local 10 members wanted to transfer to Local 13, and that some of them already owned homes in Southern California. "Originally they were coming down and working, and Local 13 wasn't watching it," Freese said. UF # 62. He reported that Plaintiffs had been released by the SF Port Committee, and that the Coast had agreed to release them for transfer to Local 13. "However, Local 13 rules are still in place that says we will accept you on a reciprocal transfer basis only," Freese said. *Id.*

1    Plaintiffs filed this action on January 7, 2008. In June of that year, the Coast

2   Committee wrote a letter to the LA Port Committee. "Notwithstanding pending court action,"

3   the Coast Committee wrote,

4           the [LA Port Committee] has a contractual obligation to address
            the requests, given the action of the [SF Port Committee]. By this
5           letter, we ask that the [LA Port Committee] consider the
            Supplement I request of each individual and set forth an
6           explanation of its agreements and/or disagreements in local
            minutes, with a signed copy sent to the [Coast Committee] within
7           (30) days from the date of this letter.

8   UF # 64. The letter was signed by PMA's Thomas Edwards ("Edwards") and ILWU's Leal

9   Sundet ("Sundet"). Sundet testified that he wrote the letter because PMA officials had

10  indicated that they no longer stood by the reciprocal transfer rule. Sundet wanted to get this

11  dispute on the record.

12    On July 15, 2008, the LA Port Committee considered the transfer requests of the six

13  Plaintiffs who had been released for transfer by the SF Port Committee. Plaintiffs were not

14  notified of this meeting nor did they attend. The LA Port Committee did not address

15  Plaintiffs' reasons for seeking transfer. Instead, the focus of the meeting was the burgeoning

16  disagreement between Local 13 and PMA regarding the reciprocal transfer rule. PMA

17  expressed the view "that a reciprocal transfer is not required" and recommended that Ayala,

18  Phillips, and Lawton be approved for transfer. Pls.' Ex 78. PMA favored denying the

19  transfers of Torres, Linares, and Whitten because they had open employer complaints and

20  work records deemed unsatisfactory.

21    In January 2009, the Coast Committee addressed PMA and ILWU's disagreement

22  regarding the reciprocal transfer rule in the context of Plaintiffs' transfer requests. The

23  committee also reached disagreement regarding the reciprocal transfer rule. They agreed,

24  however, that work opportunity at the LA Port had declined such that it could not

25  accommodate Plaintiffs, precluding their transfer. The committee agreed that should Ayala,

26  Phillips, and Lawton wish to transfer when work opportunity improved, the SF Port

27  Committee would promptly re-evaluate their requests.

28

United States District Court
For the Northern District of California

1      In November 2009, this Court issued an order granting in part and denying in part

2   Defendants' motion for summary judgment. The following month, the Coast Committee

3   announced a moratorium on all Supplement I transfers. The union sought the moratorium in

4   an effort to avoid further action on transfers until PMA and the union reached agreement

5   regarding the usual rules and reciprocal transfers.

6

7   **CONCLUSIONS OF LAW**

8      Plaintiffs bring a hybrid § 301/fair representation suit against the ILWU and Local 13,

9   alleging that their union breached its duty of fair representation in violation of the National

10  Labor Relations Act and that their employer, PMA, breached the Agreement in violation of §

11  301 of the Labor Management Relations Act. Hybrid § 301/fair representation claims

12  typically arise where a union's handling of a grievance is alleged to be deficient. *Galindo v.*

13  *Stoody Co.*, 793 F.2d 1502, 1509 (9th Cir. 1986). In these cases, the employee brings a claim

14  against his employer for breaching the collective bargaining agreement, and against his union

15  for pursuing his grievance against the employer "in such a discriminatory, dishonest,

16  arbitrary, or perfunctory fashion as to breach its duty of fair representation." *DelCostello v.*

17  *Int'l Bhd. Of Teamsters*, 462 U.S. 151, 164, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983).

18  Plaintiffs' claim does not fit that prototype, and the Court is unaware of a hybrid § 301/fair

19  representation claim challenging a union's transfer process. However, as the Court has

20  already noted in the course of this litigation, the standards governing hybrid claims are well

21  established, and the parties agree that they apply to this case.

22      A hybrid § 301/fair representation suit, "as a formal matter, comprises two causes of

23  action." *DelCostello*, 462 U.S. at 164, 103 S.Ct. 2281.

24           The suit against the employer rests on § 301, since the employee
             is alleging a breach of the collective bargaining agreement. The
25           suit against the union is one for breach of the union's duty of fair
             representation, which is implied under the scheme of the National
26           Labor Relations Act. Yet the two claims are inextricably
             interdependent. To prevail against either the company or the
27           Union, . . . [employee-plaintiffs] must not only show that their
             discharge was contrary to the contract but must also carry the
28           burden of demonstrating a breach of duty by the Union.

14

United States District Court

For the Northern District of California

*Id.* at 164-65 (internal quotations, footnote, and citations omitted; alteration in original). In other words, "[w]hether the defendant is the union or the employer, the required proof is the same: The plaintiff must show that there has been both a breach of the duty of fair representation and a breach of the [Agreement]." *Bleisner v. Commc'n Workers of Am.*, 464 F.3d 910, 913-14 (9th Cir. 2006).

While Plaintiffs argue that they have proven both elements of their hybrid claim, they contend that they need not prove that PMA breached the Agreement in order to prevail in this case. They are incorrect. In *Bleisner*, a plaintiff bringing a hybrid § 301/fair representation claim appealed a district court's grant of summary judgment because the court did not reach the duty of fair representation issue. 464 F.3d at 914. The Ninth Circuit stated that "nothing requires the district court to decide the fair representation question first." *Id.* "Deciding the [contract] question first is not merely permissible. It is also a normal and entirely sensible procedure frequently followed by a court confronted with two potentially dispositive questions, one of which is easier to resolve." *Id.*; *see also Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 664 (7th Cir. 1992) (plaintiff did not prove breach of contract, and therefore the district court properly dismissed the hybrid § 301/fair representation claim without reaching the duty of fair representation); *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555 (6th Cir. 1990).

Plaintiffs do not cite *Bleisner*, but they argue that its reasoning is incorrect. They cite *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, a Supreme Court case that states that "[f]ederal courts have jurisdiction to hear fair representation suits whether or not they are accompanied by claims against employers." 493 U.S. 67, 83, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989). That may be true, but *Breininger* did not involve a hybrid § 301/fair representation claim. The Court in *Breininger* merely determined that federal courts have jurisdiction over standalone duty of fair representation claims. *Id.* at 83-84. Courts that have considered *Breininger*'s impact on hybrid § 301/fair representation suits have determined that the case does not allow these suits to survive a failure of proof as to breach of contract. *See Talbot*, 961 F.2d at 664 n.7; *Levias v. Pacific Maritime Ass'n*, No. C09-0302 RSL, 2010

WL 3501939, at *4 n.9 (W.D. Wash. Sept. 3, 2010). The Court is bound by *Bleisner*'s clear holding that both the contract and the fair representation elements are dispositive in a hybrid claim.[6] 464 F.3d at 914. Accordingly, it will turn to whether Plaintiffs have proven that (1) PMA violated the Agreement and (2) ILWU or Local 13 breached their duty of fair representation.

## I. Breach of the Collective Bargaining Agreement

Plaintiffs submitted an eighty-seven page document proposing the findings of fact and conclusions of law to be drawn from seven days of trial in this case. The entirety of Plaintiffs' legal argument with respect to whether PMA violated the Agreement spans a single, eight-line paragraph. Plaintiffs correctly point out that the LA Port Committee's membership is split between PMA and Local 13, and thus any contract breach by the committee is appropriately attributed to the employers and union alike. Plaintiffs contend that the committee breached the Agreement in two ways: (1) by failing to address Plaintiffs' transfer requests for an eight-month period; and (2) by discriminating against Plaintiffs and showing favoritism.

## A. Addressing the Transfer Requests

Plaintiffs contend that the LA Port Committee had a contractual obligation to address Plaintiffs' transfer requests, and that by waiting some eight months to do so, the committee breached the Agreement.

Plaintiffs fail to cite a specific provision of the Agreement that requires the LA Port Committee to address Plaintiffs' transfer requests. Instead, they point to the Coast Committee's June 2008 letter to the LA Port Committee. This letter states that the LA Port

---

[6] Plaintiffs also argue that *Williams v. Pacific Maritime Association*, 384 F.2d 935 (9th Cir. 1967) allows them to prevail without proving breach of contract. In *Williams*, the court stated in dicta that if it were to determine that summary judgment was appropriate as to the breach of contract claim against plaintiffs' employer, this determination would not warrant dismissal of all claims against all defendants. Even if this statement were a pronouncement relating to the viability of a hybrid claim where the breach of contract element cannot be proven, it is dicta and does not overcome the rule in *Bleisner*, 464 F.3d at 914.

United States District Court
For the Northern District of California

Committee "has a contractual obligation to address [Plaintiffs'] requests, given the action of the [SF Port Committee]." Pls.' Ex. 77. The letter seems to say that because Plaintiffs' home port had acted upon Plaintiffs' requests, the receiving port was obligated by the Agreement to do so as well. Defendants argue that the Coast Committee wrote the letter not to point out a contractual violation, but to prompt the LA Port Committee to memorialize the disagreement regarding the reciprocal transfer rule. Be that as it may, however, the letter confirms what is implied in the Agreement – that a Class A longshoreman seeking transfer is entitled to a process that at some point involves a hearing before the LA Port Committee. *See* Agreement, Supp. I, § 1.4.

The LA Port Committee considered Plaintiffs' transfer requests in July 2008. Plaintiffs say that their contractual right to be heard by the LA Port Committee arose at least eight months earlier, and that the delay violated the Agreement. Plaintiffs fail to explain what gave rise to their right to a hearing before the LA Port Committee. Based upon the timeline of events in this case, the Court assumes that Plaintiffs believe that their right to an audience with the LA Port Committee was triggered by the ILWU's October 2007 letter to Plaintiffs' counsel. Regardless of whether Plaintiffs had this or another event in mind, they have not shown that delay violates the Agreement.[7] The Agreement is silent as to timing. When Plaintiffs' counsel asked PMA's Edwards whether the Agreement contained any time limit for the consideration of transfer requests, Edwards said no.

> Q. Can [transfer requests] pend for as long as ten years, for example?
> A. Hypothetically. There are no time limits stated in Supplement I.

Trial Tr. vol. VI at 889:15-17. Plaintiffs make no attempt to negate this testimony, or to establish that the Agreement should be interpreted to include a reasonable time limit. Even if they had, Plaintiffs have failed to submit evidence that would allow the Court to evaluate

---

[7] The Court's analysis assumes that Defendants are solely responsible for the delay. However, Defendants argue that Plaintiffs are to blame for the delay because Plaintiffs did not bring their transfer requests to the Local 13 Executive Board. The Court need not address this argument because even if Defendants were responsible for the delay, Plaintiffs have not proven that the delay violated the Agreement.

United States District Court
For the Northern District of California

1  whether the delay here was reasonable. The Court does not know whether an eight month

2  delay is out of the ordinary in the course of LA Port Committee business. Plaintiffs cite no

3  evidence showing how often the LA Port Committee meets, or how long it usually takes for

4  similar issues to work their way through the union system. Accordingly, Plaintiffs have failed

5  to prove by a preponderance of the evidence that the LA Port Committee's delay violated the

6  Agreement.

7

8  **B. Discrimination or Favoritism**

9       Plaintiffs' alternative contract theory is that PMA, through the LA Port Committee,

10  engaged in favoritism and discrimination. They cite two provisions of the contract. One

11  forbids "favoritism or discrimination in the hiring or dispatching or employment of any

12  longshoremen qualified and eligible under the Agreement." Agreement § 8.43. The other

13  prohibits

14       discrimination in connection with any action subject to the terms
         of this Agreement (including at work sites, joint dispatch halls,
15       training sites, and other locations, when reasonably related to
         employment covered by this Agreement) either in favor of or
16       against any person because of membership or nonmembership in
         the Union . . . .

17

18  *Id.* at § 13.1.

19       Plaintiffs offer no analysis of these provisions, nor do they attempt to explain how the

20  evidence introduced at trial demonstrates that these provisions were violated. The extent of

21  their analysis is that "[g]iven the extensive history of animus towards members of Local 10

22  in general and Plaintiffs in particular, the [LA Port Committee's] actions also violate" the

23  Agreement's prohibition against discrimination. Pls.' Proposed Findings of Fact and

24  Conclusions of Law 83:6-7, January 19, 2011, ECF No. 200 [hereinafter "Pls.' PFFCL"].

25  Plaintiffs fail to identify which actions they deem discriminatory, preventing the Court from

26  analyzing whether Plaintiffs' status as members of Local 10 impermissibly entered into the

27  decisionmaking process. No favoritism or discrimination is apparent to the Court, and

28  Plaintiffs' breach of contract argument must fail.

1    While a finding that Plaintiffs have not proven breach of the Agreement is sufficient

2  to defeat Plaintiffs' hybrid claim, the Court now turns to whether Plaintiffs have proven a

3  breach of the duty of fair representation.

4

5  **II. Breach of the Duty of Fair Representation**

6    As the Ninth Circuit explained,

7      [t]he duty of fair representation is a judicially established rule
       imposed on labor organizations because of their status as the
8      exclusive bargaining representative for all of the employees in a
       given bargaining unit. The duty of fair representation exists
9      because a single labor organization represents the interests of all
       employees within a unit, and if individual employees are not to
10     be deprived of all effective means of protecting their own
       interests, it must be the duty of the representative organization to
11     serve the interests of all members without hostility or
       discrimination toward any, to exercise its discretion with
12     complete good faith and honesty, and to avoid arbitrary conduct.
       The burden of proving a breach of the duty of fair representation
13     is on the plaintiff.

14  *Beck v. UFCW, Local 99*, 506 F.3d 874, 878-79 (quotations and citations omitted).

15    Plaintiffs argue that Defendants breached the duty of fair representation through

16  arbitrary, discriminatory, and bad faith conduct. *See id.* at 879. The Court will address these

17  arguments in turn.

18

19  **A. Arbitrariness**

20  **1. Legal Standard**

21    The traditional test for arbitrariness is deferential to unions. This deference is lost

22  "only if, in light of the factual and legal landscape at the time of the union's actions, the

23  union's behavior is so far outside a wide range of reasonableness . . . as to be irrational." *Air*

24  *Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991)

25  (quotation and citation omitted). This standard "gives the union room to make discretionary

26  decisions and choices, even if those judgments are ultimately wrong." *Beck*, 506 F.3d at 879

27  (quotations omitted).

28

*United States District Court*
For the Northern District of California

19

United States District Court
For the Northern District of California

1    Plaintiffs urge the Court to apply a more searching standard that applies where a union

2  is alleged to have violated the duty of fair representation while administering an exclusive

3  hiring hall. *See Lucas v. Nat'l Labor Relations Board*, 333 F.3d 927, 934-35 (9th Cir. 2003).

4  In *Lucas*, the Ninth Circuit held that a union has a "heightened duty of fair dealing that

5  applies to a union's operation of an exclusive hiring hall." *Id.* This duty "requires [the union]

6  to operate by reference to objective criteria." *Id.* at 935 (quotation omitted). In this context,

7  "any union activity that prevents an employee from being hired" "plac[es] the burden on the

8  union to justify its actions." *Id.* "[T]his presumption can be overcome only by establishing

9  either that the union acted in accordance with a valid union security clause or that the union

10  action was necessary to the effective performance of its duty to represent its constituency."

11  *Id.* (footnote omitted). *Lucas* involved a union's attempt to expel a member from the hiring

12  hall. 333 F.3d 927, 929. The court explained that an exclusive hiring hall "is akin to an

13  employment agency where all employees hired by an employer are those referred by the

14  union." *Id.* at 929 n.2. Reading Supreme Court precedent to hold that "when a union decides

15  to operate a hiring hall, it takes on added responsibility because it wields a special power

16  over workers' livelihoods," *id.* at 932 (citing *Breininger*, 493 U.S. at 89, 110 S.Ct. 424), the

17  Ninth Circuit held that the traditional, deferential standard for arbitrariness was inadequate.

18    Plaintiffs make no attempt to analyze whether the facts here give rise to a heightened

19  duty. They highlight no evidence showing the way in which the conduct they complain of

20  relates to the operation of a hiring hall. They fail to analyze what it means to prevent a union

21  member from being hired, or whether Defendants' conduct qualifies. They merely assert that

22  the heightened duty applies "when a union operates a hiring hall." Pls.' PFFCL at 68:1-2. At

23  oral argument, Defendants argued that Plaintiffs' allegations have nothing to do with the

24  hiring hall. Plaintiffs had an opportunity to respond to this argument and they did not. Under

25  these circumstances, the Court declines Plaintiffs' invitation to apply the heightened standard

26  here.

27

28

United States District Court

For the Northern District of California

As noted above, the deferential standard for arbitrariness typically insulates a union's judgment, even if that judgment is wrong. *Beck*, 506 F.3d at 879. The Ninth Circuit has analyzed arbitrariness "on a continuum." *Id.*

> On one end of the continuum is intentional conduct by a union exercising its judgment. As noted above, a union's conduct constitutes an exercise of judgment entitled to deference even when the union's judgments are ultimately wrong. Under Supreme Court precedents, so long as a union exercises its judgment, no matter how mistakenly, it will not be deemed wholly irrational. We may decline to give a union the deference owed to an exercise of judgment only where union actions or inactions are so far outside the range of reasonableness that [they are] wholly irrational or arbitrary.
> . . .
> On the other end of the continuum are actions or omissions that are unintentional, irrational or wholly inexplicable, such as an irrational failure to perform a ministerial or procedural act. We have referred to such actions or omissions as "arbitrary" action. For example, courts have consistently refused to accept unions' claims that their actions involved any judgment or strategy where the union simply failed to perform some procedural act.

*Id.* at 879-80 (quotations and citations omitted) (alteration in original). For example, courts have found arbitrary conduct where (1) a union representative failed to research the collective bargaining agreement, *Peters v. Burlington N.R.R. Co.*, 931 F.2d 534, 541 (9th Cir. 1991); (2) a union failed to provide adequate notice of meetings, missed time limits, and provided late notification of a decision, *Moore v. Bechtel Power Corp.*, 840 F.2d 634, 637 (9th Cir. 1988); (3) a union representative failed to notify the employer that an employer was a steward, a status relevant to layoffs, *Galindo*, 793 F.2d at 1514; and (4) a union failed to file a grievance on time, *Dutrisac v. Caterpillar Tractor Co.*, 749 F.2d 1270, 1274 (9th Cir. 1983). "[M]ere negligence on the part of a union does not rise to the level of a breach of the duty of fair representation." *Peters*, 931 F.2d at 538.

Rather than confront this fact-intensive analysis by comparing Defendants' conduct to that found deficient in other cases, Plaintiffs merely pull out lines from fair representation cases and list them in their brief. For example, Plaintiffs note that in *Williams v. Pacific Maritime Association*, the Ninth Circuit stated that "the duty of fair representation requires the union to explain to members of the bargaining unit their rights and duties under the collective bargaining agreement." 617 F.2d 1321, 1331 (9th Cir. 1980). No doubt it does, but

this rule does not live in a vacuum. *Williams* involved a situation in which a union had adopted new standards for deregistering union members. One of the questions before the Court was whether the union had violated the duty of fair representation by failing to give notice of the new standards for discharge. The Court found that it had not. Arguments can be made regarding how to apply *Williams* here, but Plaintiffs do not make them. Instead, they recount Defendants' conduct and label it a violation of the duty to explain a union member's hardship transfer rights, or the "duty to communicate and to keep bargaining unit members informed of the status of their requests" – a duty presumably derived from *Williams*. Pls.' PFFCL at 74:4, 13-14. The Court accepts that a union can violate the duty of fair representation when it fails to explain a union member's rights, but the failure to explain must be evaluated on the continuum of allegedly arbitrary conduct described above.[8]

Some clear rules have developed in the context of the duty of fair representation's arbitrariness standard, particularly with respect to alleged defects in the grievance process. Cases warn against the perfunctory handling of grievances and require unions to conduct some minimal investigation of grievances brought to their attention. *See Vaca v. Sipes*, 386 U.S. 171, 191, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) (no perfunctory processing of grievances); *Peters*, 931 F.2d at 540 ("[A] union's unexplained failure to consider a meritorious substantive argument in favor of an employee signals that the process has broken down and has much more in common with a ministerial failure than with a negligent decision."); *Tenorio v. NLRB*, 680 F.2d 598, 601 (9th Cir. 1982) (To comply with its duty of fair representation, "a union must conduct some minimal investigation of grievances brought to its attention."). Plaintiffs cite these cases and imply that the grievance process is analogous

---

[8] The same problem arises in Plaintiffs' statement that "[l]etting a bargaining unit member's grievance simply languish in limbo is highly arbitrary and a breach of the duty of fair representation," Pls.' PFFCL at 67:9-10, citing *Herman v. United Brotherhood of Carpenters and Joiners, Local No. 971* in support. 60 F.3d 1375, 1380 (9th Cir. 1995). Plaintiffs misrepresent *Herman*. *Herman* states that "[g]iven the factual circumstances of [plaintiff's] claim, it would be highly arbitrary for [her] union to ignore her grievance or to simply let it languish in limbo." *Id.* It goes on to analyze those circumstances in detail before determining that the plaintiff had raised a triable question of fact regarding whether the union had breached its duty of fair representation. Thus *Herman* confirms that the arbitrariness analysis depends upon context.

*United States District Court*
For the Northern District of California

to the transfer process. Yet they offer no explanation for why this is so. Despite the importance of context to the duty of fair representation analysis, Plaintiffs fail to explain whether the grievance and transfer processes share factual circumstances that are, in fact, analogous. While the Court will not discount grievance cases, it will measure arbitrariness according to the continuum described above.

Finally, even if a union's conduct is arbitrary, this conduct "can breach the duty of fair representation only where the act substantially injures the union member." *Beck*, 506 F.3d at 880. This injury

> may arise in situations where the individual interest at stake is strong and the union's arbitrary action or omission completely extinguishes the employee's [grievance] right[s], or where the union's arbitrary actions reflect reckless disregard for the rights of an individual employee, or severely prejudice the injured employee under circumstances that do not further the policies underlying the duty of fair representation.

*Id.* (quotations and citations omitted) (alteration in original).

## 2. Analysis

In all, Plaintiffs label nine union actions – or instances of inaction – as arbitrary. They challenge: (1) Local 13's recordkeeping of transfers and transfer criteria; (2) the fact that Local 13 stopped letting Plaintiff Lawton work as a visitor; (3) Local 13's policy of requiring transfer requests to go before the executive board before reaching the LA Port Committee; (4) Porras's statement regarding whether Local 10 could arrange an owe-me exception to the reciprocal transfer rule; (5) Dong's statement to Whitten, after hearing he was from Local 10, that a transfer was not going to happen; (6) ILWU and Local 13 officials not responding to letters and phone calls, and not following up on promises to look into the possibility of a transfer; (7) the LA Port Committee's lack of action on Plaintiffs' transfer requests from October 2007 to June 2008; (8) the fact that the LA Port Committee addressed Plaintiffs' requests in July 2008 but did not inform Plaintiffs it was doing so; and (9) union officials' ignorance of Plaintiffs' reasons for seeking transfer. The Court will address these events in turn.

*a. Recordkeeping*

Plaintiffs challenge Defendants' methods of keeping track of hardship transfer criteria and owe-me transfer arrangements, as well as its failure to brief incoming union leaders on these issues. They argue that the failure to write down the criteria for hardship transfers breached the union's duty to inform Plaintiffs of the rules regarding transfer, and that the failure to record owe-me arrangements and brief new union leaders ensured the arbitrary administration of the transfer process. These arguments are unpersuasive. Plaintiffs have not shown that Defendants deviated from an established practice or rule in the way it kept records of hardship transfers and owe-me arrangements, or in the way it briefed new union leaders. Defendants were free to use their judgment in determining how to handle these issues, and the evidence presented at trial shows that Defendants relied upon meeting minutes to record union practices. Plaintiffs have not persuaded the Court that this was unreasonable.

Insofar as Plaintiffs argue that Defendants had an obligation to precisely define in writing the terms in the Agreement governing transfers, this argument falls short. In *Marquez v. Screen Actors Guild*, the Supreme Court dismissed a similar argument in a case in which a union member challenged a union's use of terms of art in a contract. "The logic of petitioner's argument has no stopping point; it would require unions (and all other contract drafters) to spell out all the intricacies of every term used in a contract. Contracts would become massively unwieldy treatises, yet there would be no discernible benefit from the increased mass." *Marquez*, 525 U.S. 33, 47-48, 119 S.Ct. 292, 142 L.Ed.2d 242 (1998). Similarly, a union party to a contract need not spell out the intricacies of every term in the contract once it is written. Defendants and PMA interpreted the Agreement's general provisions on a case-by-case basis as matters came before Port and Coast Committees. The minutes memorializing their decisions became part of the Agreement, subject to modification under certain circumstances. This process is reasonable, and the Court is not persuaded that Defendants had an additional obligation to write a separate document explaining the rules governing transfers.

*b. Visiting Privileges*

Plaintiffs argue that Defendants acted arbitrarily when they would not allow Lawton to work as an authorized visitor in the LA Port. They contend that he was a victim of "collective punishment against members of Local 10" in retaliation for Lindenberg's lawsuit, and that this conduct was irrational. Yet the record shows that Local 13 stopped allowing Lawton to work as a visitor during the same time period that Local 13 began enforcing a rule limiting the number of days per year that a visitor could work. Even if the union began enforcing this rule as a result of its issues with Lindenburg, this conduct is not irrational or arbitrary. Plaintiffs fail to point to facts in the record showing that Defendants departed from the ninety-day rule in its dealings with Lawton, or that Lawton was treated differently from other visitors. The mere fact that Defendants stopped allowing Lawton to work as a visitor does not prove arbitrariness.

*c. Executive Board Requirement*

Plaintiffs argue that Local 13's policy of requiring transfer requests to be heard by the Local 13 Executive Board in advance of the LA Port Committee violates the Agreement and "is inherently arbitrary, unreasonable, and a violation fo the duty of fair representation." Pls.' PFFCL at 80:9. The Agreement imposes some requirements upon Port Committees in the course of considering transfer requests, but it is silent regarding the process by which a transfer request must reach the Port Committee. Local 13's judgment as to what this silence allows is not outside the range of reasonableness or wholly irrational. This is especially true in light of the fact that this rule appears to have been in place years before Plaintiffs sought transfers to Local 13. *See* Pls.' Exs. 21, 23. Accordingly, Plaintiffs have not shown that this rule breaches the duty of fair representation.

*d. Conversation with Porras*

Plaintiffs argue that Porras's conversation with Ayala in 2002 or 2003 regarding owe-me transfers was arbitrary. Plaintiffs contend that "[s]ince it was obvious that Ayala did not

have a reciprocal at the time, Porras's failure to explain to Ayala that non-reciprocal hardship transfers were available" was arbitrary. Pls.' PFFCL at 72:12-14. Plaintiffs are correct that union representatives must "explain to members of the bargaining unit their rights and duties under the collective bargaining agreement," *Williams*, 617 F.2d at 1331, and that in some cases, the failure to do so is a breach of the duty of fair representation. As explained above, however, this obligation depends on context. Plaintiffs fail to conduct a thorough analysis of why the duty to explain was triggered here, and the Court finds that it was not. Porras had been given no indication that Ayala might qualify for a hardship transfer or have an interest in seeking one. Even if Porras was negligent in not explaining the process for obtaining a hardship transfer, negligence does not amount to a breach of the duty of fair representation.

Even if Porras's conduct was arbitrary, Plaintiffs do not argue, much less show, that this conduct substantially injured Ayala. Thus Plaintiffs have not proven an arbitrary breach of the duty of fair representation.

*e. Dong's Statement to Whitten*

Plaintiffs contend that "Dong's failure to inform Whitten of Local 13's standards for obtaining hardship transfers . . . breached Local 13's duty to explain the rights of bargaining unit members." Pls.' PFFCL at 74:2-4. As explained above, the duty of fair representation can be breached by a failure to inform a union member of his or her rights, but whether it does so depends on context. Plaintiffs fail to analyze the context here, or explain why it gives rise to a duty to inform. Even if the Court were persuaded that Dong's conduct was arbitrary, however, Plaintiffs have failed to show that Dong's conduct substantially injured Whitten. Whitten's transfer rights were not extinguished as a result of Dong's conduct. Nor does Whitten appear to have been severely prejudiced. While Dong's out-of-hand answer to Whitten's question might be in the realm of arbitrariness, it cannot be said to demonstrate a reckless disregard for Whitten's rights. Plaintiffs fail to make any arguments to the contrary, and the Court cannot find that Dong's conduct breached the duty of fair representation.

*f. Communications*

Plaintiffs argue that Defendants' failure to respond to letters and phone calls, and their failure to follow through on promises to look into the possibility of a transfer, violated Defendants' duty to inform union members of their rights under the Agreement. Specifically, Plaintiffs challenge: (1) Coast Committeemen Wenzl and Ortiz's failure to respond to the September 2005 letter as they told Ayala they would; (2) Local 13 President Mendoza's failure to communicate with Lawton and Phillips after stating that he would work on their transfer requests; and (3) Ponce de Leon's failure to respond to Local 10's May 2007 letter and Plaintiffs' June 2007 letter.

Wenzl, Ortiz, and Mendoza do not appear to have violated a clear rule or union practice. Their failure to follow up, while regrettable, cannot be said to be irrational or wholly inexplicable. Plaintiffs assert that these union leaders violated a ministerial duty to communicate, but Plaintiffs conduct no analysis that persuades the Court to apply *Williams* here. *See* 617 F.2d at 1331.

With regard to Ponce de Leon, Plaintiffs argue that when Ponce de Leon received Local 10's letter in May 2007, he had "a duty to communicate the status of [Plaintiffs'] requests and any problems with it so they could act accordingly." Pls.' PFFCL at 75:7-8. Plaintiffs argue that this failure to communicate breached the duty of fair representation in two ways: (1) by preventing Plaintiffs from understanding that their lack of reciprocal was holding up their transfer requests; and (2) by depriving Plaintiffs of the knowledge that non-reciprocal transfers had been granted in the past, thereby preventing Plaintiffs from using this knowledge in presenting their transfer requests. Plaintiffs have not shown that Ponce de Leon had a duty to communicate with Plaintiffs after receiving Local 10's letter. While communication can be considered ministerial, the duty to communicate is not ever-present. Plaintiffs have not shown that Ponce de Leon deviated from a clear practice of communicating with transfer applicants at this juncture. Without this showing, the Court concludes that Ponce de Leon exercised his judgment regarding whether to communicate with Plaintiffs.

Similarly, Plaintiffs contend that Ponce de Leon violated his duty to communicate with Plaintiffs after he received Plaintiffs' July 2007 letter asking that their transfer requests be heard by the LA Port Committee, or for a written response as to why the request would not be heard. Ponce de Leon initially put Plaintiffs' requests on the next LA Port Committee agenda but removed them after conferring with PMA regarding the fact that they did not have reciprocals. As above, Plaintiffs have not shown that Ponce de Leon had a duty to communicate with Plaintiffs at this stage in the process. When to give notice in the transfer process was not spelled out in the Agreement and does not appear to have been a matter of common union practice. The lack of clarity as to the union's process regarding transfers contributes to this Court's finding that Defendants were at most negligent in their dealings with Plaintiffs.

Even if Plaintiffs had shown that Wentzl, Ortiz, Mendoza, and Ponce de Leon acted arbitrarily, they fail to show a resulting substantial injury. Plaintiffs' only mention of injury relates to Ponce de Leon's response to Local 10's May 2007 letter. They contend that this response prevented them from understanding the cause for delay and denied them an opportunity to adequately present their hardship transfer requests. Plaintiffs fail to analyze these harms under the substantial injury standard set forth in *Beck*. It does not appear to the Court that Plaintiffs' transfer rights were extinguished by this conduct, or that this conduct reflected reckless disregard for Plaintiffs' rights. Nor does the Court conclude that this conduct severely prejudiced Plaintiffs. Accordingly, Plaintiffs have not shown that Wenzl, Ortiz, Mendoza, or Ponce de Leon violated the duty of fair representation through arbitrary conduct.

*g. Delay*

Plaintiffs contend that the LA Port Committee's lack of action regarding Plaintiffs' transfer requests between October 2007 and July 2008 was arbitrary. The Court heard no evidence of a practice or contractual duty on the part of the LA Port Committee to hear the transfer requests earlier than July 2008. Even if such a practice or duty existed, the delay is

United States District Court

For the Northern District of California

1  attributable to confusion regarding the LA Port Committee's obligation to hear non-

2  reciprocal transfer requests that have not first been presented to the Local 13 Executive

3  Board. In light of this uncertainty, the LA Port Committee's delay was reasonable.

4        Even if Plaintiffs had shown that the LA Port Committee had a ministerial duty to

5  hear Plaintiffs' transfer requests earlier than June 2008, Plaintiffs have made no attempt to

6  explain to the Court how the delay substantially injured them. Plaintiffs have therefore failed

7  to prove a breach of the duty of fair representation.

8

9  *h. Failure to Inform Plaintiffs of Hearing*

10       The LA Port Committee's failure to alert Plaintiffs to the fact that it was planning to

11  address their transfer requests is not an arbitrary breach of the duty of fair representation.

12  Plaintiffs have offered no evidence of a clear rule or procedure requiring unions to inform

13  members that transfer requests will be addressed at an upcoming meeting. Case law shows

14  that in some cases, unions are not required to inform members of upcoming meetings. *See*

15  *Evangelista v. Inlandboatment's Union*, 777 F.2d 1390, 1397 (9th Cir. 1985). Plaintiffs fail

16  to analyze the circumstances of this meeting and explain why Defendants had a duty to

17  inform them of it.

18       Even if Defendants did act arbitrarily by not informing Plaintiffs of the hearing,

19  Plaintiffs have not proven a breach of the duty of fair representation. Plaintiffs argue that the

20  lack of notice "ensur[ed] that there would be no-one (sic) at this meeting advocating for

21  Plaintiffs and explaining their individual reasons for seeking transfer." Pls.' PFFCL at 13-14.

22  Plaintiffs merely assert this injury; they do not analyze whether it should be considered

23  substantial in light of duty of fair representation case law. They also do not persuade the

24  Court that Defendants alone are responsible for this injury. Plaintiffs' correspondence with

25  the LA Port Committee did not indicate that Plaintiffs were seeking a hardship transfer.

26  Plaintiffs also eschewed the Local 13 Executive Board, which appears to have been the

27  appropriate venue for presenting Plaintiffs' reasons for seeking transfer. Plaintiffs have not

28

United States District Court

For the Northern District of California

1  addressed these and other facts in light of case law, and thus have not meet their burden of

2  proving a breach of the duty of fair representation.

3

4  *i. Defendants' Ignorance of Plaintiffs' Reasons for Transfer*

5        Plaintiffs contend that Defendants' ignorance of Plaintiffs' reasons for transfer

6  "reflects a pervasive culture of perfunctory handling of outsiders' transfer requests." Pls.'

7  PFFCL at 82:18-19. They specifically challenge the ignorance of Ponce de Leon, Local 13's

8  Chris Viramontes ("Viramontes"), Freese, Ortiz, and Sundet. While ignorance could be a

9  symptom of perfunctory handling of a transfer request, Plaintiffs cite no authority suggesting

10 that this fact alone proves a breach of the duty of fair representation. Plaintiffs' own conduct

11 likely contributed to these officials' ignorance of their reasons for seeking transfer. Without a

12 more robust analysis of the conduct giving rise to this ignorance, the Court cannot find that it

13 was so perfunctory as to be arbitrary.

14

15 **B. Whether the Unions' Conduct Was Discriminatory**

16 **1. Legal Standard**

17       Plaintiffs also argue that several aspects of Defendants' conduct was discriminatory.

18 While the arbitrary prong of the duty of fair representation "looks to the objective adequacy

19 of the Union's conduct, the discrimination and bad faith analyses look to the subjective

20 motivation of the Union officials." *Simo v. Union of Needletrades*, 322 F.3d 602, 618 (9th

21 Cir. 2003) (citing *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1243 (7th Cir.

22 1997)). To "establish that the union's exercise of judgment was discriminatory, a plaintiff

23 must adduce 'substantial evidence of discrimination that is intentional, severe, and unrelated

24 to legitimate union objectives.'" *Beck*, 506 F.3d at 880 (quoting *Amalgamated Ass'n of St.,*

25 *Elec. Ry. & Motor Coach Employees of Am. v. Lockridge*, 403 U.S. 274, 301, 91 S.Ct. 1909,

26 29 L.Ed.2d 473 (1971)). As the Ninth Circuit has noted, precedent offers "little guidance as

27 to what constitutes discrimination in the duty of fair representation context." *Simo*, 322 F.3d

28 at 618. "Invidious" discrimination is prohibited by the duty of fair representation, and

United States District Court

For the Northern District of California

1   "discrimination is invidious if based upon impermissible or immutable classifications such as

2   race or other constitutionally protected categories, or arises from prejudice or animus." *Id.* at

3   618-19 (quoting *Considine v. Newspaper Agency Corp.*, 43 F.3d 1349, 1359-60 (10th Cir.

4   1994)). A union also may not "discriminate on the basis of union membership." *Id.* at 619

5   (quoting *Bernard v. Air Line Pilots Ass'n, Int'l*, 873 F.2d 213, 216 (9th Cir. 1989). As this

6   Court has previously held, however, some differentiation among classes of employees, even

7   when that classification is based upon local membership, "does not, as a matter of law,

8   violate the union's duty of fair representation." Order Granting in Part and Den. In Part Mot.

9   for Summ. J. 14, Nov. 5, 2009, ECF No. 150 (quoting *Williams*, 617 F.2d at 1330 ("[T]he

10  law of fair representation clearly permits a union to negotiate for and agree to contract

11  provisions involving disparate treatment of distinct classes of workers . . . as long as such

12  conduct is not arbitrary or taken in bad faith.")).

13         Plaintiffs argue that the Court should apply case law developed under the Americans

14  with Disabilities Act ("ADA"), the Age Discrimination in Employment Act ("ADEA"), and

15  Title VII of the Civil Rights Act of 1964 ("Title VII"). These rules apply here, they argue,

16  because Defendants operated an exclusive hiring hall, which is "akin to an employment

17  agency where all employees hired by an employer are those referred by the union." *See*

18  *Lucas*, 333 F.3d at 929 n.2. This is the extent of Plaintiffs' reasoning and it is not persuasive.

19  Plaintiffs ignore the fact that the rules they cite are specific to the burdens of proof and

20  substantive legal standards of the ADA, ADEA, and Title VII. For example, Plaintiffs cite

21  *Dominguez-Curry v. Nevada Transportation Department*, which states that "[w]here a

22  decisionmaker makes a discriminatory remark against a member of the plaintiff's class, a

23  reasonable factfinder may conclude that discriminatory animus played a role in the

24  challenged decision." 424 F.3d 1027, 1038 (9th Cir. 2005). The Court does not dispute this

25  rule, nor does it suggest that discriminatory remarks have no bearing upon a duty of fair

26  representation analysis. But in *Dominguez-Curry*, the inquiry was whether the evidence

27  suggested that the defendant's conduct was "due in part or whole to discriminatory intent."

28  *Id.* at 1037 (quotation omitted). That is a different inquiry than whether discriminatory

animus was severe, intentional, and unrelated to legitimate union objectives. *See Beck*, 506 F.3d at 880 (quotation omitted). Furthermore, Plaintiffs must prove discriminatory animus by substantial evidence, whereas *Dominguez-Curry* rejected this burden as too high with respect to direct evidence of discriminatory intent. *See* 424 F.3d at 1037-38. Plaintiffs have made no effort to reconcile this or other problems inherent in importing case law from one legal landscape to another. While Plaintiffs highlight basic tenets that might aid the Court – such as inferring discriminatory intent from the falsity of an explanation, for example – they have not persuaded the Court to evaluate Defendants as it would an employer being sued under the ADA, the ADEA, or Title VII.

**2. Analysis**

Plaintiffs offer ten events as evidence of discrimination. They challenge: (1) Podue's statements; (2) Ponce de Leon's statement regarding a history of bad blood between Local 10 and Local 13, (3) Sundet's testimony that union leaders advocate more for people from their own local than from another; (4) Porras's statement regarding whether Local 10 could get an owe-me exception to the reciprocal transfer rule; (5) Ayala's inability to obtain night work; (6) the fact that Local 13 stopped letting Lawton work as a visitor; (7) Dong's statement to Whitten, after hearing that he was from Local 10, that a transfer was not going to happen; (8) the events of Local 13's May 2007 Executive Board meeting; (9) the events of Local 13's October 2007 Executive Board meeting; and (10) the Coast Committee's 2009 Memorandum. The Court will address these events in turn.

*a. Podue and Ponce de Leon*

Plaintiffs fail to link Podue and Ponce de Leon's statements to any decision or action relating to Plaintiffs' transfer requests. Assuming that Podue did say that he did not give a damn about any local other than Local 13, and that he would "flood the fucking hall" before letting Plaintiffs transfer, Plaintiffs have failed to link these statements to any detrimental decision made or action taken with regard to Plaintiffs' visiting privileges or transfer

32

1    requests. Ponce de Leon was more involved in Plaintiffs' efforts to transfer – he put

2    Plaintiffs' transfer requests on the LA Port Committee agenda and then removed them,

3    believing, he said, that Plaintiffs transfer requests were defective because they did not

4    involve reciprocal transfers. Plaintiffs have not shown that Ponce de Leon's actions were

5    motivated by "bad blood," or that his actions were related to anything other than an attempt

6    to follow the reciprocal transfer rule. Just as the Ninth Circuit in *Conkle v. Jeong* found no

7    nexus between union leaders' personal animus against the plaintiff and their decision

8    regarding her medical release, the Court finds no nexus between Podue or Ponce de Leon's

9    comments and any conduct toward Plaintiffs. *See Conkle*, 73 F.3d 909, 916 (9th Cir. 1995).

10

11   *b. Sundet*

12        Sundet testified that union leaders advocate more for longshore workers from their

13   own local than from another. Plaintiffs fail to link this statement to any conduct with respect

14   to Plaintiffs. Such a general statement, without more, does not support a claim of

15   discrimination under the duty of fair representation.

16

17   *c. Porras's Statements to Ayala*

18        The fact that Porras told Ayala that an owe-me relationship with Local 10 "won't

19   work" and that the union "can't do that" does not violate the duty of fair representation.

20   Plaintiffs characterize this as an "unexplained outright rejection of the possibility of an owe-

21   me transfer . . . [that] evidences discriminatory animus against Local 10." Pls.' PFFCL at

22   72:11. Yet Plaintiffs have not shown that an owe-me relationship with Local 10 could have

23   worked, or that the reason Porras said it would not work was because of discriminatory

24   animus against Local 10. Porras's statement regarding his view of the chances of securing an

25   owe-me arrangement with Local 10, without more, does not demonstrate that intentional or

26   severe discrimination was at work. Porras's failure to explain the reason for his answer

27   cannot be characterized as discriminatory. The statements of other union leaders, analyzed

28   above, do not disturb this conclusion.

*United States District Court*
For the Northern District of California

*d. Ayala and Night Work*

Likewise, Plaintiffs have not persuaded the Court that the hoops Dong required Ayala to go through to obtain night work in 2003 were motivated by discrimination. Plaintiffs point to a letter from Local 8 to Local 13 confirming that Local 13 members would get night work in Portland if Local 8 members were given the same opportunity in the LA Port. Ayala presented a similar letter from Local 10 and did not get night work. Plaintiffs assume that Local 8 members were allowed to worked nights in the LA Port as a result of Local 8's letter, but Plaintiffs cite no evidence in support of this assumption. The record before the Court leaves open the possibility that Local 8's letter was as ineffective as Ayala's letter.

Furthermore, Plaintiffs seem to invite the Court to infer that Dong's actions were motivated by the bad blood described by Ponce de Leon, or the hostility evidenced by Podue. Ponce de Leon's and Podue's statements are not substantial evidence of Dong's motivations.

*e. Visiting Privileges*

Plaintiffs have also failed to prove that Defendants' conduct with respect to Lawton's visiting privileges was discriminatory. As explained above, Plaintiffs have not shown that Defendants' decision regarding Lawton's visiting privileges was anything other than an application of the rule regarding visitors. The fact that the rule might have been enforced after a Local 10 member filed a lawsuit against Local 13 is not substantial evidence that discrimination was at play. Plaintiffs offer no evidence showing that Local 13 applied the rule to Local 10 members only. Furthermore, the statement that "one bad apple spoils the bunch" is vague. The record does not indicate who "the bad apple" is, or who "the bunch" is. It could be that Lindenberg's 2004 lawsuit prompted Local 13 to read the rules more carefully, and that the bunch that he spoiled was the situation in which all visitors, regardless of where they came from, were allowed to check in at the LA port indefinitely. Plaintiffs have not shown substantial evidence of discrimination here.

34

United States District Court

For the Northern District of California

1    *f. Dong's Statement to Whitten*

2         Dong's statement to Whitten in September 2005 also does not show a breach of the

3    duty of fair representation. Dong's first question, when Whitten asked about the possibility of

4    a hardship transfer, was which local Whitten came from. When Whitten told Dong he was a

5    member of Local 10, Dong said Local 13 wasn't taking any transfers. Whitten persisted, and

6    Dong said, "Brother, it's not going to happen." Trial Tr. vol. II at 318. Then Dong walked

7    away. The timing of Dong's question regarding Whitten's local membership is suspicious.

8    Yet suspicion is not substantial evidence, even when considered in light of the other union

9    leaders' statements. Furthermore, Plaintiffs' fail to analyze Dong's conduct according to

10   whether it was intentional, severe, and unrelated to legitimate union conduct. Thus the Court

11   cannot find that Dong's actions were motivated by discrimination.

12

13   *g. Local 13's May 2007 Executive Board Meeting*

14        Plaintiffs argue that Local 13's Executive Board engaged in discrimination at a

15   meeting in May 2007. At that meeting, Local 13 President Mitre told the board that Local 13

16   could send Ayala and others back to their port. Podue explained that Local 13 did not need to

17   grant Plaintiffs travel cards for another thirty days. Plaintiffs argue that these statements are

18   evidence of a "retaliatory response." Pls.' PFFCL at 75:21-22. However, these statements

19   can also be read as part of a non-retaliatory discussion of what to do about the fact that Ayala

20   and other Plaintiffs were pursuing transfers but had not brought their transfer requests before

21   the Local 13 Executive Board. Furthermore, Plaintiffs have not shown that Local 13 took the

22   actions discussed at the meeting. Accordingly, the statements made at Local 13's May 2007

23   Executive Board meeting did not breach the duty of fair representation.

24

25   *h. Local 13's October 2007 Executive Board Meeting*

26        The events at Local 13's October 2007 Executive Board meeting are also not

27   discriminatory. At the meeting, Freese reported that Plaintiffs wanted to transfer to Local 13

28   and that some of them already owned houses nearby. He stated that "[o]riginally they were

35

coming down and working, and Local 13 wasn't watching it." UF # 62. He further explained

that "Local 13 rules are still in place that says we will accept you on a reciprocal transfer

basis only." *Id.* Plaintiffs note that "this discussion did not involve efforts to accommodate

Plaintiffs." Pls.' PFFCL at 78:12-13. Yet Freese's statements reveal that he did not think

Plaintiffs needed to be accommodated because they had not satisfied the reciprocal transfer

rule. Even if he was incorrect, this is a reasonable, non-discriminatory explanation for his

failure to accommodate Plaintiffs. Plaintiffs also argue that "Freese expressed animus

towards Plaintiffs with his statement that they were coming down and working and 'Local 13

wasn't watching it.'" Pls.' PFFCL at 78:14-15. This statement does not demonstrate animus.

It is consistent with the reason union witnesses gave for why Local 13 began enforcing the

ninety-day visitor rule – Local 13 had not been paying attention to the rule. Freese seems to

have been explaining to the executive board why Plaintiffs had been able to work in the LA

Port for so long as visitors. Plaintiffs have failed to prove that this was a breach of the duty of

fair representation.

*i. The Moratorium*

Finally, Plaintiffs challenge the Coast Committee's December 2009 moratorium on

transfers. "The timing of this moratorium, coming immediately after the Court permitted this

case to proceed to trial, suggests that the stated reasons for the moratorium were merely a

pretext for retaliation and yet further efforts to stymie Plaintiffs' chances of ever transferring

to the LA Port." Pls.' PFFCL at 82: 1-5. As an initial matter, the mere suggestion of

discrimination does not satisfy Plaintiffs' burden. Furthermore, a more reasonable

explanation for the moratorium is the well-documented disagreement between PMA and the

ILWU regarding the reciprocal transfer rule. Plaintiffs point to the testimony of Ortiz and

Viramontes in support of their assertion that the moratorium "came about as a result of this

lawsuit." Pls.' PFFCL at 63:17. Ortiz's and Viramontes's testimony does not support the

notion that PMA and the ILWU imposed the moratorium in retaliation for Plaintiffs' lawsuit.

Instead, Ortiz and Viramontes explained that the Coast Committee imposed the moratorium

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    because of the disagreement that had developed between PMA and the ILWU as a result of

2    Plaintiffs' transfer requests.

3

4    **C. Whether the Union Conduct Was in Bad Faith**

5         To prove bad faith, Plaintiffs must show "substantial evidence of fraud, deceitful

6    action or dishonest conduct." *Beck*, 506 F.3d at 880 (quoting *Lockridge*, 403 U.S. at 299, 91

7    S.Ct. 1909). Plaintiffs cite *Tenorio*, which states that "the Union must be careful to protect

8    the interest of all those whom it represents." 680 F.2d at 602. Plaintiffs seem to suggest that

9    *Tenorio* sets an alternative standard in bad faith cases, but *Tenorio* deals with arbitrariness

10   under the duty of fair representation, not bad faith. *Id.* at 601 n.4. Thus *Tenorio* is irrelevant

11   to the Court's bad faith analysis.

12        Plaintiffs challenge the following events as motivated by bad faith: (1) the handling of

13   ninety-two Local 10 members' requests to transfer; (2) Local 13's verbal approval of Ayala,

14   Lawton, and Phillips' transfers in 2005; (3) Coast Committee members' failure to follow up

15   with Ayala, Lawton, Phillips, and Whitten after saying they would; (4) Local 13 President

16   Mendoza's failure to follow up on his promise to work on Lawton and Phillips' transfer

17   requests; (5) the June 2007 voice mail from Freese; (6) Ayala's June 2007 conversation with

18   Freese; and (7) the reason for the Coast Committee's 2009 decision with regard to Plaintiffs'

19   transfer requests. The Court will analyze these events in turn.

20

21   *a. Requests of Ninety-Two*

22        Plaintiffs argue that Defendants' handling of the requests of ninety-two longshore

23   workers to transfer from the SF Port to the LA Port involved bad faith. Plaintiffs point out

24   that the Coast Committee and the LA Port Committee waited nearly six months before

25   denying these requests, and that these committees' minutes do not explain the reason for

26   denial. Plaintiffs also note that neither Ayala nor Lawton, who were on the list of ninety-two

27   workers requesting transfer, heard the fate of their transfer request or why their request was

28   denied. According to Plaintiffs,

United States District Court

For the Northern District of California

> [t]he delay by these committees, along with their failure to explain in their minutes . . . or otherwise . . . what, if anything, was defective about these requests, was deceptive because it created the impression in Plaintiffs and other longshore workers that a non-reciprocal transfer from the SF Port to the LA Port was possible without satisfying either the hardship . . . or owe-me . . . exceptions.

Pls.' PFFCL at 71:21-22; 72:1-4. The test for bad faith is not whether Plaintiffs were deceived. It is whether Defendants acted deceitfully. The Court heard no evidence suggesting that the Coast and LA Port Committees intended to deceive anyone in their handling of the ninety-two transfer requests. The fact that Plaintiffs were misled, without more, does not signal a breach of the duty of fair representation.

*b. Verbal Approval of Transfer*

Similar reasoning defeats Plaintiffs' argument that Local 13's verbal approval of Plaintiffs' transfers was a bad faith breach of the duty of fair representation. According to Plaintiffs, the verbal approval "deceptively created the impression that such non-reciprocal transfers from the SF Port to the LA Port were possible without satisfying either the hardship or owe-me exceptions." Pls.' PFFCL at 73:12-14. Again, Plaintiffs confuse their own impressions with Defendants' intent. The Court does not know who verbally approved the transfers, much less what motivated him or her to do so. Plaintiffs have failed to show any evidence of bad faith here, much less the substantial amount required to prove bad faith.

*c. Wenzl and Ortiz*

Plaintiffs argue that Wenzl and Ortiz acted in bad faith when in September 2005 they told Ayala that they would read his letter and get back to him. Plaintiffs contend that these "promises were made with fraudulent intent, i.e., with intent not to call back." Pls.' PFFCL at 74:12-13. Yet Plaintiffs fail to point out any evidence of Wenzl or Ortiz's intent. An innocent explanation is just as likely as a nefarious one. Accordingly, Plaintiffs have failed to meet their burden of proving that Wenzl and Ortiz acted in bad faith here.

*d. Mendoza*

Similarly, Plaintiffs argue that Mendoza acted in bad faith when he told Lawton and Phillips that he would try to work on their hardship transfers. Plaintiffs' evidence of bad faith is the fact that Mendoza did not follow up with Lawton and Phillips. Yet Plaintiffs did not offer evidence that Mendoza promised to follow up with Lawton and Phillips – he promised to work on a hardship transfer. The Court heard no evidence about Mendoza's efforts on Lawton and Phillips' behalf. Mendoza's failure to report back to Lawton and Phillips does not prove bad faith. The lack of evidence regarding Mendoza's fraudulence, deceptiveness, or dishonesty precludes a finding that Mendoza acted in bad faith.

*e. Freese's Voice Mail*

Freese's June 2007 voice mail message to Ayala, when played in Court, revealed hostility. It did not show a bad faith breach of the duty of fair representation. Plaintiffs argue that Freese's statement that "no item could be placed on the LA Port Committee agenda without the approval of Local 13's officers" "was deceptive." Pls.' PFFCL at 76: 3-4, 18. Plaintiffs focus on the alleged falsity of Freese's statement rather than whether Freese knew what he was saying was false. This is a fatal oversight in a bad faith analysis. Furthermore, Plaintiffs' own evidence shows that Local 13's Executive Board had been presented with several transfer requests in the past. *See* Pls.' Exs. 18, 21, 23, 25. Freese might have been hostile, but the Court cannot conclude that he acted in bad faith.

*f. Freese's June 2007 Statement to Ayala*

According to Plaintiffs, in June 2007 "Freese told Ayala that the only way to transfer to the LA Port was by reciprocal transfer." Pls. PFFCL at 76: 22-23. Plaintiffs fail to cite evidence in the record showing that Freese made this statement. Even if Freese did make this statement, the fact that Freese knew about past hardship transfers is not substantial evidence that he acted in bad faith. It is possible that Freese knew about past hardship transfers and believed, in good faith, that Local 13 had the discretion to stop taking in hardship transfers.

39

United States District Court

For the Northern District of California

1  Innocent explanations for Freese's conduct are at least as plausible as bad-faith explanations,

2  and Plaintiffs have therefore not satisfied their burden of proof.

3     Plaintiffs also argue that during Ayala's June 2007 conversation with Freese, Freese

4  said that the Executive Board would consider Ayala's transfer request. Once again, it is not

5  clear to the Court that Freese made this statement to Ayala. The citation offered by Plaintiffs

6  refers to Ayala's testimony:

7       [Freese] said, "Again, Brother, the procedure is you go to the
        executive board. If the executive board allows you, you go to the
8       membership. If the membership allows you, then you go to the
        LRC.
9           At that point, I said, "Are you denying me the right to go
        to the LRC?" His response, "Again, you have to go to the
10      executive board. If the executive board allows you, then you go
        to the membership. If the membership allows you, then you go to
11      the LRC. We are talking about this, and I'm telling you Brother,
        we are not taking anyone in.

12

13  Trial Tr. vol. I at 68:7-16. This passage cannot be construed to indicate that Freese promised

14  that the Executive Board would consider Ayala's transfer request. Freese told Ayala that

15  Ayala needed to go before the Executive Board, something Ayala had done in the course of

16  seeking approval to work in the LA Port as a visitor. The phrase, "[w]e are talking about

17  this," is vague at best, and cannot be construed as a promise by Freese to bring the transfers

18  to the Executive Board. Accordingly, Plaintiffs have failed to show that Freese acted in bad

19  faith and breached the duty of fair representation.

20

21  *g. January 2009 Coast Committee Meeting*

22     Plaintiffs challenge the ILWU's determination at the January 2009 Coast Committee

23  meeting that the LA Port Committee properly denied Plaintiffs' transfer requests.

24  Specifically, Plaintiffs challenge the ILWU's reasoning that Plaintiffs' transfer requests were

25  properly denied because "[t]he [SF Port Committee] minutes do not reference the reasons for

26  approval as required by [the Agreement]." Pls.' Ex. 86. Plaintiffs argue that "this position is

27  deceptive" because the LA Port Committee does not typically state its reasons for approving

28  transfer requests out of the LA Port. While the ILWU might have been incorrect in its view

1   of the obligations of a sending port, Plaintiffs offer no evidence that the ILWU intended to

2   defraud or act deceitfully when it made this statement. Accordingly, Plaintiffs have failed to

3   show that the ILWU made this statement in bad faith.

4

5   **CONCLUSION**

6          For the reasons set forth above, Plaintiffs do not prevail with respect to their hybrid §

7   301/fair representation claim. They have failed to prove that PMA violated the Agreement,

8   and they have not shown that Defendants breached the duty of fair representation. Therefore,

9   Judgment shall be entered in favor of Defendants on Plaintiffs' hybrid § 301/fair

10  representation claim.

11

12  **IT IS SO ORDERED.**

13

14  Dated: 07/25/11                              _____

15                                               THELTON E. HENDERSON, JUDGE
                                                 UNITED STATES DISTRICT COURT

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

41